2015-1533

---

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

ALLIED ERECTING AND DISMANTLING CO., INC.,

Respondent-Appellant

v.

GENESIS ATTACHMENTS, LLC,

Petitioner-Appellee

---

Appeal from the Patent Trial and Appeal Board of the United States Patent and Trademark Office in *Inter Partes* Reexamination No. 95/001,352

---

## BRIEF OF APPELLANT ALLIED ERECTING & DISMANTLING

Richard L. Byrne
James G. Porcelli
Daniel H. Brean
THE WEBB LAW FIRM
One Gateway Center
420 Fort Duquesne Blvd., Suite 1200
Pittsburgh, PA 15222
Telephone: (412) 471-8815

*Counsel for Appellant Allied Erecting &*
*Dismantling Co., Inc.*

May 14, 2015

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Allied Erecting v. Genesis Attachments, LLC, 2015-1533

## CERTIFICATE OF INTEREST FOR
## <u>ALLIED ERECTING & DISMANTLING CO., INC.</u>

Counsel for Allied Erecting & Dismantling Co., Inc. hereby certifies the following:

1.     The full name of every party or amicus represented by me is:

      Allied Erecting and Dismantling Co., Inc.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

      Allied Gator, Inc.
      John R. Ramun

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

      None.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

      Richard L. Byrne, The Webb Law Firm
      James G. Porcelli, The Webb Law Firm
      Daniel H. Brean, The Webb Law Firm

Dated:  May 14, 2015

                /s/ Daniel H. Brean
                Daniel H. Brean
                *Counsel for Appellant*

# TABLE OF CONTENTS

**CERTIFICATE OF INTEREST FOR ALLIED ERECTING & DISMANTLING CO., INC.** .................................................................. i

**TABLE OF CONTENTS** ................................................................ ii

**TABLE OF AUTHORITIES** ......................................................... iv

**STATEMENT OF RELATED CASES** .............................................. vi

**JURISDICTIONAL STATEMENT** .................................................. 1

**STATEMENT OF THE ISSUE** ....................................................... 1

**STATEMENT OF THE CASE** ........................................................ 1

   I.   PROCEDURAL HISTORY .......................................................... 1

   II.  BACKGROUND OF THE TECHNOLOGY ....................................... 5

      A.  The '489 Patent .......................................................... 5

      B.  The Caterpillar German Utility Model ............................ 12

      C.  The Ogawa Patent ...................................................... 20

      D.  The Clark Patent ........................................................ 21

   III.  THE JUDGMENT OF THE PTAB ............................................. 22

**SUMMARY OF THE ARGUMENT** ................................................ 26

**STANDARD OF REVIEW** ............................................................ 28

**ARGUMENT** ............................................................................. 29

   I.   THE BOARD RELIED ON IMPROPER HINDSIGHT, IN THE ABSENCE OF ANY VALID REASONING OR SUPPORTING EVIDENCE, FOR ITS OBVIOUSNESS CONCLUSION ......................................................................... 29

      A.  Caterpillar Expressly Teaches Away from Combining its Teachings with Ogawa ..................................................... 32

B.   Following the Board's Reasoning Would Fundamentally Redesign  and Reconstruct Caterpillar to Change its Principle of Operation and  Result in an Inoperable Device..................................................................................38

1.   Making the Second Jaw Movable in Caterpillar Involves Substantial, Nonobvious Redesign and Reconstruction.............................................40

2.   Making the Second Jaw Movable in Caterpillar Fundamentally Changes the Principle of Operation of Caterpillar ................................................48

3.   Making the Second Jaw Movable in Caterpillar as Suggested by the Board Renders the Device Inoperable ....................................................50

**CONCLUSION**.................................................................................................**55**

**ADDENDUM** ...................................................................................................**56**

# TABLE OF AUTHORITIES

## *CASES*

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993) ..............................................................54

*Consol. Edison Co. v. Nat'l Labor Relations Bd.*,
  305 U.S. 197 (1938) ..............................................................28

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
  567 F.3d 1314 (Fed. Cir. 2009) .............................................. 37, 38, 50

*In re Dembiczak*,
  175 F.3d 994 (Fed. Cir. 1999) ...............................................30

*In re Gleave*,
  560 F.3d 1331 (Fed. Cir. 2009) .............................................28

*In re Gurley*,
  27 F.3d 551 (Fed. Cir. 1994) ................................................. 32, 34, 38

*In re Kahn*,
  441 F.3d 977 (Fed. Cir. 2006) ...............................................31

*In re Keller*,
  642 F.2d 413 (CCPA 1981)...................................................23

*In re Kubin*,
  561 F.3d 1351 (Fed. Cir. 2009) .............................................30

*In re McLaughlin*,
  443 F.2d 1392 (CCPA 1971)..................................................25

*In re Mettke*,
  570 F.3d 1356 (Fed. Cir. 2009) .............................................28

*In re Morsa*,
  713 F.3d 104 (Fed. Cir. 2013) ...............................................28

*In re Mouttet*,
  686 F.3d 1322 (Fed. Cir. 2012) ............................................................49

*In re Ratti*,
  270 F.2d 810 (CCPA 1959)...................................................... 39, 48, 49

*In re Sneed*,
  710 F.2d 1544 (Fed. Cir. 1983) ............................................................23

*In re Sponnoble*,
  405 F.2d 578 (1969) .............................................................................38

*Karston Manufacturing Corp. v. Cleveland Golf Co.*,
  242 F.3d 1376 (Fed. Cir. 2001) ............................................................38

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007) ........................................................ 23, 30, 31, 38

*McGinley v. Franklin Sports, Inc.*,
  262 F.3d 1339 (Fed. Cir. 2001) ............................................... 38, 50, 52

*Para-Ordnance Mfg., Inc. v. SGS Imp. Int'l, Inc.*,
  73 F.3d 1085 (Fed. Cir. 1995) ..............................................................28

*Plas-Pak Indus. v. Sulzer Mixpac AG*, No. 2014-1447,
  2015 U.S. App. LEXIS 1456 (Fed. Cir. Jan. 27, 2015) ................... 39, 48, 49, 50

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contrs. USA, Inc.*,
  617 F.3d 1296 (Fed. Cir. 2010) ............................................................29

*United States v. Adams*,
  383 U.S. 39 (1966) ..............................................................................34

## *STATUTES*

28 U.S.C. § 1295(a)(4)(A) ......................................................................1

35 U.S.C. § 103 .....................................................................................30

## <u>STATEMENT OF RELATED CASES</u>

No other appeal in or from this same proceeding was previously before this Court or any other court of appeals.

Allied Erecting & Dismantling Co. Inc. ("Allied") is asserting U.S. Patent No. 7,121,489  ("the '489 Patent" or the "Allied Patent") against Genesis Attachments, LLC ("Genesis") in *Allied Erecting & Dismantling Co. et al. v. Genesis Equip. & Mfg., Inc. et al.*, No. 4:08-cv-00589-SL (N.D. Ohio).  That case is currently stayed pending the final outcome of this appeal.

Allied and its undersigned counsel are unaware of any other actions now pending in this or any other court that may directly affect or be directly affected by this Court's decision in the present appeal.

## JURISDICTIONAL STATEMENT

Because this is an appeal from a final decision of the Patent Trial and Appeal Board (the "PTAB" or "Board") in an *inter partes* reexamination proceeding, this Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF THE ISSUE

Whether the PTAB correctly found claims 1-21 of the '489 Patent obvious where the PTAB relied on improper hindsight reasoning to conclude that a person skilled in the art would have extensively modified the prior art in ways that would render the prior art devices inoperable and unsuitable for their intended purposes.

## STATEMENT OF THE CASE

### I.    PROCEDURAL HISTORY

On May 5, 2010, Genesis Attachments, LLC ("Genesis") filed a petition for *inter partes* reexamination with respect to U.S. Patent No. 7,121,489 ("the '489 Patent" or the "Allied Patent"), owned and utilized by inventor John R. Ramun, Allied Gator, Inc., and Allied Erecting & Dismantling Co. Inc. (collectively, "Allied").  A2160-64.  Genesis contended that there existed 24 distinct "substantial new questions of patentability" of anticipation and obviousness, spread across 26

1

different prior art references, all of which allegedly warranted reexamination. *Id*. Genesis challenged all of claims 1-19 of the '489 Patent.

The USPTO agreed that Genesis had presented substantial new questions of patentability as to all of claims 1-19, and instituted the reexamination. A2061-62. In the first Office Action of the proceeding, however, the Examiner immediately confirmed the patentability of claims 3 and 9, and adopted only two of Genesis' 24 proposed grounds for rejection. A2084-89; A2097. Specifically, the Examiner rejected claims 1, 2, 4, 6-8, 10, and 12-19 as being anticipated by U.S. Patent No. 4,283,866 to Ogawa ("Ogawa," A0145-51), and also rejected the same claims, plus claims 5 and 11, as obvious over U.S. Patent No. 4,403,431 to Ramun et al. ("Ramun") in view of Ogawa. A2084-89

After both parties responded to the Office Action, the Examiner issued a non-final Action Closing Prosecution, which maintained the same anticipation and obviousness rejections over Ogawa and Ramun, and declined to adopt any of Genesis' other positions. A1905, A1908-16. Allied submitted an amendment making changes to independent claims 1, 7, 17-19, and added new independent claims 20-21. A1888-94. The amendments and new claims recited, *inter alia*, that the bridge housing "encas[ed]" or "engag[ed]" the main pivot pin, and that both blades were "movable" relative to each other and relative to the bridge housing. *Id.* The Examiner initially declined to enter Allied's amendment, but later allowed

2

the claim amendments to be entered along with certain minor changes.  A1734-37 (initial rejection of amendment); A1646-52 (further amended claims); A1579-80 (acceptance of amendment).

After accepting and evaluating the claims, as amended, the Examiner withdrew all outstanding rejections and issued a Right of Appeal Notice confirming the patentability of all of claims 1-21. A1579-80.  Genesis appealed to the Board with respect to the withdrawal of the rejections actually issued, as well as the failure to issue several other rejections proposed by Genesis in its petition. A1570-71.  An oral hearing was held on July 25, 2012.  A1370.

The Board ultimately affirmed-in-part, entered new grounds of rejection, and remanded for further consideration.  A0039; A0072-73.   The Board sustained the Examiner's decision not to reject the claims on various grounds, and also sustained the Examiner's withdrawal of the anticipation rejections over Ogawa.  A0072-73. However, the Board held that claims 1-3, 13-14, and 17-20 would have been obvious over German Utility Model No. DE 297 15 490 U 1 ("Caterpillar," A0131-44) in view of Ogawa, noting that this constituted a new ground of rejection allowing Allied to reopen prosecution or request rehearing.  A0064-68 (citing 37 C.F.R. § 41.77(a)-(b)).  The Board then remanded for the Examiner to determine whether claims 4-12, 15-16, and 21 were also obvious over Caterpillar

in view of Ogawa, in further view of U.S. Patent No. 5,546,683 to Clark ("Clark," A). A0068-69.[1]

Allied elected to reopen prosecution and submitted further amendments to claims 1, 7, and 17-19. A0124-30. Allied also submitted argument and a declaration from John R. Ramun, the named inventor of the '489 Patent and the President of Allied, to help demonstrate patentability in light of the new grounds of rejection. A1343-51; A3055-58. Because Genesis had only previously provided the USPTO with a partial translation, Allied additionally submitted a certified full translation of the Caterpillar reference. A0131-44. Genesis responded and submitted its own declaration from Daniel P. Jacobson, Genesis' Director of Engineering. A1336-39.

Allied petitioned to strike Genesis' response and the Jacobson Declaration for improperly introducing new issues beyond the scope of the Board's decision. A1276-80. Specifically, Allied demonstrated that Genesis and Mr. Jacobson were relying on the teachings of three prior art references not relied on by the Board or put in issue based on Allied's response to the Board's decision. *Id.* At a minimum, Allied argued that it should be permitted to submit comments in response to Genesis' newly cited prior art. *Id.*; *see also* A1281-86 (proffered Patent Owner comments). The Board denied Allied's petition in full. A1258-63.

---

[1] Notably, rejections over Caterpillar and Clark had been proposed by Genesis in its Petition, but were never adopted by the Examiner. A2091.

After reviewing the parties' submissions, the Examiner maintained the new ground of rejection based on Caterpillar and Ogawa.  A1250-51.  The Examiner also adopted the Board's proposed rejections based on Caterpillar, Ogawa, and Clark.  A1251.  Thus, all of claims 1-21 were rejected for obviousness.  The Examiner relied on the Jacobson Declaration (and the newly cited prior art therein) when deciding to issue all of the rejections on remand.  A1250-51.  Following the parties' subsequent arguments to the Examiner, the Examiner closed prosecution and returned the proceeding to the Board for reconsideration.  A1132.

Nearly a full year later, the Board issued a New Decision that maintained all the rejections.  A0012-13.  Allied submitted a request for rehearing.  A1113-23.  Eight months later, the Board denied Allied's request and reaffirmed the rejections.  A0002-3.  This appeal followed.

## II.   BACKGROUND OF THE TECHNOLOGY

### A.   The '489 Patent

The '489 Patent, entitled "Multiple Tool Attachment System," dates back to provisional applications filed in October 1999 and April 2000.  The invention is directed to heavy machinery tools used for demolition and recycling purposes, such as tools having multiple movable jaws capable of cutting through steel I-beams and crushing concrete.  '489 Patent, at 1:20-62.  Fig. 1, for example, depicts

a heavy duty shear (10) attached to a body (18), which is attached to a piece of demolition equipment such as a backhoe (not shown):



FIG. 1

'489 Patent, at 5:51-65. To be capable of performing such powerful work, the shears alone might typically weigh on the order of 10,000 pounds, and often impart shear forces on the order of thousands of tons. *See* A2014-16.

Traditionally, such tools (i.e., shears, crushers, grapples etc.) were designed independently such that "one type of tool associated with each body can have the greatest possible utility and application." '489 Patent, at 1:57-62. As the '489 Patent explains, the problem with this fragmented approach is that is it "does not provide a system for easily changing tools or a system which allows complete separate tools to efficiently share a common structure." '489 Patent, at 2:30-32. Thus, a stated purpose of the '489 Patent is "to provide a multiple tool attachment system which is easily converted between a plurality of distinct tools." '489

Patent, at 2:42-46.  In furtherance of this goal, the '489 Patent describes a "quick change feature[]" or "quick release system" that, for the same construction machine, enables various demolition tools to efficiently be swapped out for each other during a demolition project or in a recycling application.  *See, e.g.,* '489 Patent, at Abstract, 3:3-7.

The body (18) depicted above in Fig. 1 is referred to as a "universal body . . . because it remains common to a series of tools or tool units [i.e., jaw sets] in the attachment system."  '489 Patent, at 5:59-62.  Each jaw set has a main pin (16)[2] about which the jaws (12, 14) can rotate.  '489 Patent, at 5:56-59.   A bridge housing (48) surrounds the main pin (16) "and is utilized for quickly and easily attaching the main pin 16 and the associated jaw set to the universal body 18." '489, at 6:56-59.  The bridge housing is the crux of the claimed invention.

At a high level, the following figure demonstrates how the jaw set can be quickly and easily attached and detached via the bridge housing:

---

[2] The main pin (16) is mislabeled in Fig. 1.  Fig. 2 clarifies that the main pin (16) is the circular element at the intersection of the jaws (12, 14), specifically at the nexus of the cutting portions (190, 194) of the jaws.



A2019; A2013-15. The details of this structural arrangement will now be further explained.

Fig. 57 of the '489 Patent shows the structure of the bridge housing:



**FIG. 57**

Basically, each side (19) of the universal body (18) (*see* Fig. 1) terminates at a receiving member (42) that can fit between the two bridge housing plates (405, 406). '489 Patent, at 7:28-35. The receiving member (42) has a curved surface (412) formed by a cutaway that engages with the cylindrical sleeve (408) that surrounds the main pin (16, not shown in Fig. 57) and extends between the two plates (405, 406). '489 Patent, at 6:59-62, 7:30-35. When the receiving members (42) are so engaged with the sleeve (408), apertures (52) will be aligned and keeper pins (50) can be inserted to attach the bridge housing to the universal body.

Fig. 8 is a partial sectional plan view indicating how the two receiving members (42) engage with the bridge housing (48) on each side of the main pin (16).



FIG. 8

Fig. 9 similarly shows a front view of how the receiving members (42) can be connected to each bridge housing (48) using the keeper pins (50):



FIG. 9

Importantly, this attachment and detachment method allows the main pin (16) and its surrounding bearing structure, including the bridge housing (which encases the main pin), to remain attached to the jaw set when the jaws are removed

from the universal body. '489 Patent, at 6:67 – 7:3. Not only does this avoid the need to take the jaws apart (including removal of the main pin) in order to remove the jaw set and attach a different set, but it also "provides the advantage that all the bearing or rotating surfaces will be protected from dirt and grit even when the tool unit is disassembled." '489 Patent, at 7:3-5.

Given the massive weight of demolition tool sets (typically 13,000-17,000 pounds) and the immense difficulty of precisely aligning all the bore holes and bushings on the jaws to correctly insert and remove the main pin (which itself often weighs hundreds of pounds and is covered in slippery lubricants), conventional arrangements involving removal/insertion of the main pivot pin would require approximately *8 hours* to properly swap out one jaw set for another. A2015-16 (explaining the "complicated and time consuming procedure"). But Allied's invention considerably streamlines the process by avoiding the need to remove the main pin, and brings this time down to "about *15 minutes*." A2014-15.

Claim 1 (as amended and added during reexamination, respectively) is representative of Allied's invention:

> 1. A tool set for coupling to the receiving member of a body having hydraulically powered blades, the tool set comprising:
>
> *a pair of movable blades pivoted together about a main pivot pin*;
>
> a bridge housing encasing the main pivot pin, wherein the bridge housing is separate from the movable blades;

*wherein the blades are movable relative to the bridge housing*;

wherein the bridge housing with the main pivot pin intact therein is adapted to be detachably connected to the receiving member and the pair of movable blades is adapted to be detachably connected to at least one hydraulic cylinder such that *the tool set may be removed from or attached to the body without the need to disengage or engage the main pivot pin from the blades, thereby providing a quick release system* for attaching the tool set to the body; and

wherein the bridge housing has an aperture adapted to be mated with a matching aperture of the receiving member through a removable keeper pin to secure the bridge housing to the receiving member.

A0124.

B.    The Caterpillar German Utility Model

Caterpillar, which was registered on December 11, 1997, discloses "scrap metal shears with a housing which can be attached to a piece of construction equipment." A0132.



FIG. 1

A0142.   Caterpillar explains that "[d]uring the operation of the demolition tool, it is frequently necessary to replace the jaws," and that using prior art jaws required the "swivel bearing [to] be dismantled, whereupon the two jaws must be individually uninstalled from the housing, although that is a very labor-intensive

13

and time-consuming activity."  A0133.  Caterpillar sets out to overcome such drawbacks and purports to disclose a system where "the jaws can be replaced as a unit in a simple manner."  A0134.

At a high level, the following perspective view shows how the jaw set can be attached to the body.



VIEW 1(A)

A1344, at ¶ 3(d); A3055.  The details of this arrangement will now be discussed.

Fig. 1 (above) is a side view that shows a scrap metal shear (10) with its jaws (13, 14) removed, and the jaws being connected to each other by a swivel

bearing (15).    A0136-7.    Fig. 2 shows a front view of the first jaw (13) unconnected to the housing (11):



FIG. 2

A0143.

The first jaw (13) can be attached to the housing (11) by following two distinct steps that occur in order.  A0137.   First, as can be seen in Fig. 2, a pin (21) connects the two sides of the housing (11) and protrudes from the sides of the housing (11).  These protrusions (21a) can be inserted into a grooves (22, 22a, 22b) along the opposing inside surfaces of lateral walls (13a) of the first jaw (13).  A0137-38.  Essentially, the first jaw is slipped over the protrusions and is loosely connected.  The more permanent means of attaching the first jaw (13) utilizes a tubular cross brace (24) that extends through the housing and makes an opening passing through the housing.  *See* A0142-43.  After the grooves (22) are placed over the protrusions (21a), bore holes (23) in the sides of the first jaw (13) will align with the openings at the ends of the cross brace (24).   A0137-38.  A socket pin (25) can then be inserted through the holes and cross brace, thereby attaching the first jaw to the housing.  A0137-38.

Below is a perspective view of the first jaw (13) in Caterpillar, better depicting the opposing grooves in the lateral walls (13a), and also showing that the jaw has a support plate (SP, also visible in Fig. 2) extending between the lateral walls (13a) of the jaw:



**VIEW 1(B)**

Supporting Plate
(SP)

A1344-46, at ¶¶ 3(d), 10; A3055.  Fig. 3 of Caterpillar shows the configuration of the jaws when fully attached to the housing via the pin-and-groove mounting mechanism (19) and the socket pin connection (20):



FIG. 3

A0144; A0137.

Once the first jaw is connected to the housing, a bore hole (14a, *see* Fig. 1)

in the second jaw (14) can be coupled to a lug (16a) of a hydraulic cylinder (16),

forming a bearing (18).   A0142; A0138.   In operation, force applied by the

hydraulic cylinder at the bearing (18) drives the second jaw to pivot about the swivel bearing (15). A0138. The first jaw (13), being attached to the housing by the two pins (21, 25), does not move with respect to the housing during operation.

The jaws can be removed from the housing in the reverse order. A0138. Removal of the first jaw from the housing requires removal of the socket pin (25), although the specification states that "the pin 21 can be easily extracted from the grooves 22." A0138. Additionally, because the hydraulic cylinder is "swivel-mounted on the housing" (Caterpillar, at 6) the jaws cannot be entirely removed from the housing or the underlying piece of equipment (e.g., an excavator having connection head 12) without disconnecting the bearing (18) that connects the second jaw to the hydraulic cylinder. A0136-7.

Thus, the grooves within the first jaw, and the design choice to immobilize the first jaw when the jaw set is attached, is what enables the simple attachment and detachment of the jaw set in Caterpillar. Caterpillar expressly specifies that "[t]he invention teaches a construction in which the first jaw is attached to the housing . . . while the second jaw is not mounted directly on the housing." A0134 (emphasis added). It is only by non-rotatably attaching one jaw to the housing that Caterpillar teaches it is able to have the swivel bearing "function[] only as the mutual swivel mounting of the two jaws and does not function as their attachment to the housing." A0134.

This touted advantage of immobilizing one jaw to disaggregate the pivot pin from the mounting mechanism is in stark in contrast to other prior art that Caterpillar criticizes as being inferior.  A0133.  Designs that utilize the jaws' pivot pin as the means to mount the jaws to the frame are characterized by Caterpillar as having the disadvantage that "that an optimum design . . . can be achieved only with very great difficulty, if at all."  *Id.*  Caterpillar further notes that swapping jaw sets in such designs requires "the swivel bearing [to] be dismantled, whereupon the two jaws must be individually uninstalled from the housing, although that is a very labor-intensive and time-consuming activity."  *Id.*  As explained further below, this teaching away applies squarely to the Ogawa reference and would discourage a person skilled in the art from looking to combine Caterpillar with other devices like Ogawa.

C.    The Ogawa Patent

Ogawa, which issued on August 18, 1981, discloses "[a] convertible bucket attachment for excavation and clasping."  A0145, at Abstract.



FIG . 4a

A0146.  The apparatus includes a bucket proper (1) and a sub-bucket (2), both of which are pivotably connected to the arm (11) via a pin (5') such that a hydraulic cylinder can cause both buckets to rotate.  A0149-50, at 2:59 – 3:17.  Using a complex linkage system, a single hydraulic cylinder is able to rotate and operate both buckets.  A0149, at 1:63-2:2; A0150 at 4:12-32.  The main pivot pin (5') in Ogawa is also the means by which the jaws are attached to the arm (11).  A0146, at Figs. 2 and 4a; A0149-50, at 2:59-3:10.

D.    The Clark Patent

 Clark, issued on August 20, 1996, generally discloses a demolition bucket attachment mechanism that utilizes retractable pins to attach and detach the bucket.  A0152; A0156-57, at 2:63-3:46.

## III.    THE JUDGMENT OF THE PTAB

As discussed above, the Board ultimately held that claims 1-3, 13-14, and 17-20 would have been obvious over Caterpillar in view of Ogawa, and that claims 4-12, 15-16, and 21 were also obvious over Caterpillar in view of Ogawa, in further view of Clark.  A0012.  The Board's reasoning was as follows.

In its original decision setting forth new grounds of rejection, the Board found that Caterpillar

> disclose[s] a "bridge housing" as recited by the claims in that the side walls [of the first jaw] 13a are distinct, discernable structures, and the side walls 13a serves the function of allowing the jaws to "be removed from or attached to the body without the need to disengage or engage the main pivot pin from the blades, thereby providing a quick release system for attaching the tool set to the body" as recited by the [then-pending] claims.

A0063.  According to the Board, "Caterpillar teaches one of ordinary skill in the art the desirability of simplifying disassembly of jaws, and discloses a mechanism for doing so in the lateral walls 13a having holding fixtures 19 and 20."  A0065. The Board also found that Ogawa "provid[es] two moveable blades" to enable a wide range of angular movement.  A0066.

The Board concluded that, based on these disclosures,

> it would have been obvious to one of ordinary skill in the art to apply the teaching of Ogawa with respect to articulation of both grasping members and wide range of angular movement to thereby modify Caterpillar so that the first jaw 13 with the teeth thereon also pivots about the swivel bearing 15 like second jaw 14, while also maintaining the simplified mounting and disassembly.

22

A0066. According to the Board, a person skilled in the art could, "for example, provide another mounting structure like the lateral walls 13a, or alternatively, making the teeth portion of the first jaw 13 to be separately mounted to the swivel bearing 15, as taught by Ogawa." A0066-67. The Board conceded that its "suggested modification to Caterpillar would entail design and structural changes," but dismissed the significance of such changes, stating that "it is not necessary that the inventions of the references must be physically combinable, without change, to render obvious the invention under review." A0067 (citing *In re Sneed,* 710 F.2d 1544, 1550 (Fed. Cir. 1983) and *In re Keller,* 642 F.2d 413, 425 (CCPA 1981)).

Following subsequent prosecution on remand, the Board's new decision rejected all of Allied's arguments showing that the obviousness rejections were improper. First, the Board contended that it had not failed to articulate a reason with rational underpinnings to support its conclusion of obviousness, as is required by *KSR Int'l Co. v. Teleflex Inc.,* 550 U.S. 398 (2007). A0022. According to the Board, the mobility of both blades in Ogawa provided the advantages of a wider opening and improved grasping ability, thus making it obvious to modify Caterpillar to likewise have two movable blades. A0022-23. The Board disagreed with Allied's showing that the device in Caterpillar was in no way unsuitable in terms of its jaws' mobility, and in fact was at least equally advantageous to a device dual-moving blades. A0025-26.

23

Second, the Board contended that the complexity of the modifications necessary to modify Caterpillar with two movable blades was merely a "design choice that is well within the skill of one of ordinary skill," and that the resulting disadvantages and weaknesses demonstrated by Allied resulting from such a modification would be outweighed by the advantages of wider opening and improved grasping precision. A0024-25; A0029-30. The Board was dismissive of Allied's hypothetical drawings showing the serious deficiencies and inoperability resulting from the proposed modification of Caterpillar. Without explanation, the Board held that Allied's drawings amounted to mere bodily incorporation of structures and not a combination of teachings, and thus were nonresponsive to the obviousness rejections. A0027-28.

Third, the Board deemed irrelevant the fact that Genesis's own patent (U.S. Patent No. 7,284,718, "the Genesis Patent"), filed in 2005—more than five years after the '489 Patent was filed—specifically states that "[t]here is a need for a heavy duty demolition shear with interchangeable jaw assemblies that can be easily mounted and demounted to the apparatus." A3079; A3089, at 1:65-67. The Board did not consider this fact to be at all probative of a long felt need for Allied's invention, and thus indicative of non-obviousness, primarily because the Board had already concluded that "the solution to the problem addressed by the '489 patent was already known in the art." A0031.

24

Following Allied's petition for rehearing, the Board reiterated most of its rulings and offered some minor clarifications.  A0003-7.  For example, the Board rejected Allied's showing that if, as the Board contended, a wider jaw opening was desired for Caterpillar, such additional width was attainable in a far simpler manner not requiring major reconstruction.  A0004 ("[T]he existence of another alternative solution that would allow for wider opening does not negate the fact that such wider opening is attainable by combining the teachings of Caterpillar and Ogawa."); A1115.

Most importantly, the Board denied that its judgment rested on impermissible hindsight reconstruction of the claimed invention.  A0007.  According to the Board, "[t]he Board's conclusion of obviousness set forth in the New Decision derives from proper consideration of the knowledge disclosed in the prior art of record and does not include knowledge gleaned only from the '489 patent," and was therefore proper.  *Id.* at 6 (citing *In re McLaughlin*, 443 F.2d 1392, 1395 (CCPA 1971) ("Any judgment on obviousness is in a sense necessarily a reconstruction based on hindsight reasoning, but so long as it takes into account only knowledge which was within the level of ordinary skill [in the art] at the time the claimed invention was made and does not include knowledge gleaned only from applicant's disclosure, such a reconstruction is proper.")).

# SUMMARY OF THE ARGUMENT

The Board's obviousness judgment rests on improper hindsight and must be reversed.  The claims at issue are all directed to jaw sets having two movable jaws, where the jaw sets can be attached and detached to the same construction machine without taking the time to remove the main pivot pin between the jaws.  None of the prior art relied on by the Board accomplishes this "quick change" functionality with two movable blades, or anything close to it.  The only way that the Board could possibly have found the invention obvious over the prior art of record was by improperly using the inventor's disclosure as a roadmap.

The primary reference relied on by the Board, Caterpillar, touts having one of the two blades fixed because it allows for a quick-change feature to be accomplished via attachment mechanisms built into the fixed blade.  Keeping one blade fixed in Caterpillar is thus a critical part of the core and allegedly inventive design feature in Caterpillar.  As a result, to modify the device disclosed in Caterpillar to have two movable blades, while retaining the desired quick-change feature, requires a massive, nonobvious design and reconstruction.  Caterpillar even affirmatively discourages readers of its disclosure from considering arrangements like Ogawa (the secondary reference on which the Board relied), which mount the jaw set using the main pivot pin.

26

Further, making the changes to Caterpillar that the Board deemed obvious would either lead to interference between moving parts that prevent the jaws from opening, or the removal of critical structural support resulting in total device failure. Allied presented ample evidence to the Board showing such inoperability, and no evidence in the record contradicts, let alone countervails, this evidence.

Thus, it would have required an inordinate amount of creativity and ingenuity, plus a total disregard of the core teachings of the prior art, to arrive at the claimed invention. For the Board to nonetheless deem the claimed invention obvious over Caterpillar and Ogawa required the Board to: (1) ignore the fact that Caterpillar expressly teaches that machines like Ogawa are made using poor design choices that should not be followed; (2) dismiss the fact that making the fixed second blade in Caterpillar movable fundamentally alters the Caterpillar device's principle of operation; and (3) disregard the unrebutted evidence that the modifications the Board deemed obvious render Caterpillar inoperable and unsuitable to perform its intended functions.

If Caterpillar's teaching away was not enough to discourage a person skilled in the art from following the path of Allied, any person skilled in the art would see that the modifications proposed by the Board are dramatic departures from the prior art's teachings, and that those modifications would cripple the device and render it useless. Where a person skilled in the art would be so plainly deterred at

every turn along the path that the Board would deem the obvious path, the only basis for a finding obviousness is improper hindsight. This is why obviousness is correctly found only when a person skilled in the art "would" find the combination or modification obvious, not merely when they "could." The Board's judgment to the contrary cannot be sustained.

## STANDARD OF REVIEW

"Obviousness is a legal conclusion based on underlying findings of fact." *In re Mettke*, 570 F.3d 1356, 1358 (Fed. Cir. 2009). This Court reviews the Board's factual findings for substantial evidence, and the Board's ultimate conclusion of obviousness without deference. *In re Gleave*, 560 F.3d 1331, 1335 (Fed. Cir. 2009). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. Nat'l Labor Relations Bd.*, 305 U.S. 197, 229 (1938). "Substantial evidence is less than the weight of the evidence but more than a mere scintilla of evidence." *In re Morsa*, 713 F.3d 104, 109 (Fed. Cir. 2013).

What the prior art discloses or teaches is a factual inquiry. *Para-Ordnance Mfg., Inc. v. SGS Imp. Int'l, Inc.,* 73 F.3d 1085, 1088 (Fed. Cir. 1995). Whether a prior art reference teaches away is thus a question of fact. *Id.* Whether there was a reason to combine teachings for obviousness purposes is also question of fact.

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contrs. USA, Inc.*, 617 F.3d 1296, 1303 (Fed. Cir. 2010).

## **ARGUMENT**

### I. **THE BOARD RELIED ON IMPROPER HINDSIGHT, IN THE ABSENCE OF ANY VALID REASONING OR SUPPORTING EVIDENCE, FOR ITS OBVIOUSNESS CONCLUSION**

No substantial evidence in the record exists that would allow the Board to conclude that the prior art taught the elements of the claimed invention or rendered it obvious. The cited prior art simply does not come close to teaching that the claimed invention—including, *inter alia*, claim limitations having *two* "movable" blades *and* a "quick release system" that avoids the need to remove the main pivot pin when removing or attaching jaw sets.

In fact, the unrebutted evidence shows that the prior art taught away from the claimed invention, and that the purported combination would render the prior art inoperable and unsuitable for its intended purposes. It would have required an inordinate amount of creativity and ingenuity to arrive at the claimed invention based on the prior art teachings relied on by the Board.

Thus, while the Board concluded that one skilled in the art *could* have perhaps made the claimed invention from the prior art's teachings, no evidence supports the Board's conclusion that one skilled in the art *would* have done so. Of course, whether a person having ordinary skill in the art ("PHOSITA") "would"

have found the invention obvious is the key question under Section 103. This fundamental flaw reveals that the Board's judgment is premised on impermissible hindsight, using the claimed invention as a roadmap to piece together the elements from disparate prior art references that would not have been combined by a skilled artisan at the time or in the proposed manner. *In re Dembiczak*, 175 F.3d 994, 999 (Fed. Cir. 1999) (explaining that it is improper to "take[] the inventor's disclosure as a blueprint for piecing together the prior art to defeat patentability").

As the Supreme Court has held, "[a] factfinder should be aware . . . of the distortion caused by hindsight bias and must be cautious of arguments reliant upon *ex post* reasoning." *KSR*, 550 U.S. at 421. Obviousness cannot be properly found where the purported combination arises from "throw[ing] metaphorical darts at a board filled with combinatorial prior art possibilities." *In re Kubin*, 561 F.3d 1351, 1359 (Fed. Cir. 2009). Such analysis encourages courts to "succumb to hindsight claims of obviousness" by merely indicating a remote possibility that a person skilled in the art would have proceeded down the path that the inventor did. *Id.* But remote possibility is not tantamount to obviousness, which is why exercising "common sense" is important and why it is crucial to "provide a reason for combining the elements in the manner claimed" so that the reasoning may be examined for evidence of hindsight bias. *See KSR*, 550 U.S. at 420.

Indeed, the Supreme Court emphasized that "'[r]ejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness.'" *Id.* at 418 (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006).   Despite this clear directive, here the Board relied on bare conclusions that cannot support its judgment of obviousness.   At every turn, the Board's reasoning falls apart under scrutiny and reveals only improper hindsight perspective.

Specifically, the Board failed to identify any valid reason that a PHOSITA would have combined Caterpillar and Ogawa to make the claimed invention. According to the Board, a PHOSITA would have combined Caterpillar with Ogawa even though Caterpillar expressly teaches away from using devices like Ogawa.   Without any supporting evidence, the Board concluded that a PHOSITA would find it obvious to undertake a massive redesign and reconstruction of Caterpillar.   Further, the unrebutted evidence shows that such modifications proposed by the Board would fundamentally change Caterpillar's principle of operation and render the device inoperable at the same time, both strongly indicating nonobviousness.   The Board was unreasonably dismissive of Allied's proof, and its judgment to the contrary is supported only by conclusory statements—not by substantial evidence.

A.     <u>Caterpillar Expressly Teaches Away from Combining its Teachings with Ogawa</u>

As a "general rule," this Court has recognized that it is improper to rely on a reference that teaches away from the claimed invention to formulate a *prima facie* obviousness case.  *In re Gurley,* 27 F.3d 551, 553 (Fed. Cir. 1994).  In *Gurley*, this Court explained that a reference teaches away when a PHOSITA "would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant."  *Id.*  Put another way, "a reference will teach away if it suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the applicant."  *Id.*

Here, the primary reference relied on by the Board, Caterpillar, expressly teaches away from combining its teachings with Ogawa.  After explaining the disadvantages of having to frequently replace jaws, Caterpillar points to a demolition tool disclosed in U.S. Patent No. 5,533,682 to de Gier et al. ("de Gier"):



A0133; A0188-89, at Fig. 1.[3]  In de Gier, the jaw set is pivotably attached to the frame (3) by securing the pivot pin (10) within a bore extending through the frame (3).  A0199-200, at 2:50-3:9.  In this critical respect—the main pivot pin functioning as both the pivot point for the jaws and the means of attaching the jaws to the frame—the arrangement is identical to that of the Ogawa patent.

Caterpillar is emphatically clear that such a design choice should be avoided:

[T]he swivel bearing is very complex to design and construct, and in particular has the disadvantage that the design possibilities of the pin structure are severely restricted *on account of its dual function as a swivel bearing and as a detachable mounting of the jaws*, which in

---

[3] Caterpillar specifically cites EP-A-0 641 618, which corresponds and is equivalent in disclosure to de Gier.  A3015-16.

turn means that an *optimum design with regard to both desired functions can be achieved only with very great difficulty, **if at all***.

A0133 (emphasis added).  According to Caterpillar, trying to have a pivot pin also serve as a mounting point to the frame is an inferior design that does not further the goal of both improving and simplifying the attachment and detachment process. Caterpillar specifically teaches that having both jaws pivotally mounted to the frame via the main pivot pin is expected to work poorly.  Caterpillar further notes that swapping jaw sets in such designs requires "the swivel bearing [to] be dismantled, whereupon the two jaws must be individually uninstalled from the housing, although that is a very labor-intensive and time-consuming activity." A0133.

Based on these disclosures, a PHOSITA undoubtedly "would be discouraged from following the path set out in [Caterpillar]" and would find that "the line of development flowing from [Caterpillar's] disclosure is unlikely to be productive." *Gurley,* 27 F.3d at 553; *See also United States v. Adams,* 383 U.S. 39, 52 (1966) (upholding nonobviousness where references teaching away from the claimed combination would "deter any investigation into such a combination"). Rather, Caterpillar encourages a PHOSITA to separate the main pivot pin from playing any part in the actual mounting of the jaws.  *See* A0134 (specifying that only the first jaw is "attached to the housing" via separate mounting devices, and that the

swivel bearing only serves to connect the first and second jaws); A0142 (depicting same); *see also supra*.

Although the Board purports to have relied only on Ogawa's "general teaching of providing two movable blades" rather than the precise structure of Ogawa (A0064), the other prior art of record on which the Board relied to show that dual movable blades were known suffered from the same design defects noted in Caterpillar. Specifically, the Board relied on findings of from its initial decision (A0022, citing to FF3A and FF4A), which only point to Ogawa (A0053-54) and U.S. Patent No. Re 35,432 to LaBounty (A0057) as evidence that dual-movable jaws were known.

Like Ogawa, the jaws in the LaBounty '432 patent are both mounted and pivotable about the *same pin* (24):



*See* A0204-05, at Fig. 1; A0212, at 6:20-22 ("The removable pivot pin 24 extends entirely through the pivot structure for the jaws 22, 23 and through the mounting hubs of the outside frame plates 18.1."). As such, LaBounty is simply another conventional jaw set requiring an approximately eight-hour and very burdensome attachment/removal process. A2015-16.

The same is true for other patents of record cited by Genesis as examples of dual movable blades—they all use the main pivot pin as a mounting mechanism. *See* A1337 (citing U.S. Patent No. 5,474,242 to Rafn; U.S. Patent No.4,838,493 to LaBounty; and U.S. Patent No. 5,044,569 to LaBounty); A0161-62 at Fig. 1 & A0166 at 1:53-63 (disclosing jaws pivotably attached to each other and mounted via the same aperture at reference numeral 13); A170, at Fig. 1 & A0173, at 2:60-67 (disclosing jaws mounted about pivot pin 18 that also "provide[s] a means for mounting the jaw structure"); A0181, at Fig. 1 & A0184, at 2:40-43 (disclosing "a pair of demolition jaws 22, 23 which are mounted on the connector portions 19 of frame 18 by a single removable pivot pin 24 about which the jaws 22 and 23 swing"). Thus, nothing in the record relied on by the Board or by Genesis shows any teaching of two movable blades that Caterpillar does not characterize as being inferior for mounting the jaw set via the main pivot pin. And all of these other dual-movable jaw references are merely conventional non-quick-change designs.

36

Further, while it is true that "[a] reference does not teach away . . . if it merely expresses a general preference for an alternative invention but does not 'criticize, discredit, or otherwise discourage' investigation into the invention claimed," the teaching away here plainly discredits and discourages use of the teachings in de Gier/Ogawa. *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1327 (Fed. Cir. 2009). As in *DePuy*, the discussion in Caterpillar also "expresses concern for failure" if the teaching were adopted or incorporated. *Compare id.* (using "the shock absorber feature 'decrease[s] the chance of failure of the screw") *with* Caterpillar, at 2 (questioning whether a design using a pin serving to both mount and pivot the jaws can be effective "at all").

Finally, like de Gier, Ogawa sees its common pivotal connection and mounting elements as advantageous, noting that its design uses embossments (2'') and bushes (6) to connect the two buckets (1, 2) together. A0146, at Figs. 2 and 4a; A0149-50, at 2:59-3:10. This allows the buckets to remain "connected to each other without the pin (5') fitted therethrough, which facilitates transportation and mounting of the bucket attachment to the machine arm, without necessity of re-assembling of the bucket attachment." *Id.* Thus, the teachings of Ogawa would encourage a PHOSITA to do exactly what Caterpillar says they should not do— have the main pivot pin for both jaws also mount the jaws to the frame. Such fundamentally conflicting teachings of two prior art references cannot reasonably

be viewed as suggesting their combination. *See Karston Manufacturing Corp. v. Cleveland Golf Co.,* 242 F.3d 1376, 1385 (Fed. Cir. 2001) (reversing summary judgment of obviousness where one reference taught to raise an object's center of gravity and another taught to lower the object's center of gravity).

Because Caterpillar undisputedly teaches away from the combination with Ogawa, the Board failed to make a *prima facie* case of obviousness and must be reversed. *Gurley,* 27 F.3d at 553.

> B.    Following the Board's Reasoning Would Fundamentally Redesign and Reconstruct Caterpillar to Change its Principle of Operation and Result in an Inoperable Device

This Court has long held that "[i]f references taken in combination would produce a 'seemingly inoperative device,' . . . such references teach away from the combination and thus cannot serve as predicates for a prima facie case of obviousness." *McGinley v. Franklin Sports, Inc.,* 262 F.3d 1339, 1354 (Fed. Cir. 2001) (citing *In re Sponnoble,* 405 F.2d 578, 587 (1969)). Even after *KSR* relaxed the obviousness analytical framework, this Court reaffirmed "the 'predictable result' discussed in *KSR* refers not only to the expectation that prior art elements are capable of being physically combined, but also that the combination would have worked for its intended purpose." *DePuy,* 567 F.3d at 1326 (quoting *KSR,* 550 U.S. at 398).

Further, as this Court recently explained, "combinations that change the 'basic principles under which the [prior art] was designed to operate,' . . . may fail to support a conclusion of obviousness." *Plas-Pak Indus. v. Sulzer Mixpac AG*, No. 2014-1447, 2015 U.S. App. LEXIS 1456, at *5 (Fed. Cir. Jan. 27, 2015) (quoting *In re Ratti*, 270 F.2d 810, 813 (CCPA 1959)). Specifically, if the combination "would require a substantial reconstruction and redesign of the elements shown in [the primary reference] as well as a change in the basic principle under which the [primary reference] construction was designed to operate" then the teachings of the references are not sufficient to render the claims *prima facie* obvious. *Ratti,* 270 F.2d at 813.

Here, according to the Board, the mobility of both blades in Ogawa provided the advantages of a wider opening and improved grasping ability, thus making it obvious to modify Caterpillar to likewise have two movable blades. A0022-23. The Board contended that the complexity of the modifications to make both blades movable was merely a "design choice that is well within the skill of one of ordinary skill." A0024-25; A0029-30. The Board posited that a PHOSITA could, "for example, provide another mounting structure like the lateral walls 13a, or alternatively, making the teeth portion of the first jaw 13 to be separately mounted to the swivel bearing 15, as taught by Ogawa." A0066-67.

Nothing in the record supports the Board's reasoning on these points. To the contrary, making the second jaw in Caterpillar movable involves a massive, nonobvious reconstruction of the device that not only changes its principle of operation, but renders the device inoperable as a result.

### 1. Making the Second Jaw Movable in Caterpillar Involves Substantial, Nonobvious Redesign and Reconstruction

The Board's judgment boils down to the notion that it would be obvious to convert Caterpillar (below left) to the claimed structure (below right).



A0142; A2019. But such a modification requires a massive redesign and reconstruction.

To make the second jaw in Caterpillar movable, first the jaw (13) would need to be separated from the pin-and-groove mounting portion that non-pivotably attaches to the frame, which might look like this:



A1348-49, at ¶¶ 24-28; A3056.   Then the jaw would have to be bored and connected to the swivel bearing in order to pivot about the bearing, which might look like this:



A1348-49, at ¶¶ 25-28; A3057.   However, to be operable (*but see infra*) this modification would need to account for the fact that the jaw in Caterpillar has a support plate (SP, below) extending between the two sides (13a) of the jaw, holding the sides (13a) of the jaw (13) and the blades (B1, B2) together:



42

A1345-46, at ¶ 10; A3055; *see also* A0143 (Fig. 2 of Caterpillar depicting support plate extending between opposing plates 13a). Even if the pin-and-groove mounting portion could somehow be separated from the blades (B1, B2), absent some substantial modification, the structurally-necessary support plates (SP) on the mounting portion (depicted above) and the jaw (depicted below) would interfere and the lower jaw (13) could not rotate with respect to the mounting portion:



A3058. One or the other support plates (SP) would essentially need to be removed to prevent such interference. A1348-50, at ¶¶ 26-31. As explained below, this renders the combination inoperable and thus nonobvious.

Assuming, *arguendo*, that the interference of the support plates (SP) could be adequately overcome such that the first jaw (13) *could* pivot about the swivel bearing (15), nothing exists in this structure to productively control and utilize such

movement.  The first jaw is neither held in place relative to the second jaw, nor is it driven and movable via the existing cylinder (16), and so any effort to close the jaws using the cylinder would simply push the second jaw away from the first instead of closing the jaws to apply clamping force in operation.  Thus, Genesis posited before the Board that the jaw (13) could be still further modified and another hydraulic cylinder should be added to drive the second jaw:



A1338.

Clearly this hypothetically concocted device bears no resemblance to the machine disclosed in Caterpillar, but is the result of substantial redesign and reconstruction:



None of these efforts and changes would have been obvious to a PHOSITA, and the Board cited to no evidence that rebuts Mr. Ramun's declaration or other evidence in the record explaining why, in the absence of hindsight, "such a modification would require an inordinate amount of creativity, effort, and a complete redesign." A1345, at ¶ 9. The Board dismissed the significance of the extent of the reconstruction by suggesting that Allied failed to adequately combine the teachings of the prior art and only combined the specific structures. A0027-30. Yet the Board failed to identify what "teachings" existed in the prior art that would render the specific reconstruction posited by the Board obvious. This dearth of evidence or reasoning again highlights the Board's hindsight perspective and its failure to make its *prima facie* case.

For example, Allied demonstrated to the Board that if a wider jaw opening was desirable (as the Board posited would motivate the supposed combination), there are far less complicated ways to accomplish that result. Rather than the massive redesign discussed above, a simple, minor reshaping of the first jaw blade in Caterpillar would allow for a wider opening:



A1115-16. The Board dismissed this argument as merely indicating "another alternative solution" without grappling with the fact that it shows the extensive comparative difficulty and nonobviousness of the Board's purported "alternative solution." A0004.

Similarly, the Board viewed the addition of a second hydraulic cylinder as obvious even though—apart from the added complexity—neither Caterpillar nor Ogawa utilize two cylinders. Caterpillar, as discussed above, teaches that a

stationary jaw creates attachment/detachment simplicity while requiring only a single cylinder for operation. A0137 ("When the hydraulic cylinder 16 is actuated, the second jaw 14 can be swiveled around the swivel bearing 15 relative to the first jaw 13 and relative to the housing 11, as a result of which the shear can be opened and closed."). There is certainly no advantage in Caterpillar obtained by adding the additional cost and complexity of a second cylinder.

Ogawa also only has a single cylinder operating both buckets, and in fact expressly teaches away from using multiple cylinders. Ogawa notes that, in the past, "an extra cylinder actuator has been required" and "[t]wo separate cylinder actuators have thus had to be operated" to adequately perform both clasping and excavation functions. A0149, at 1:37-48. It was a principal object and advantage of Ogawa to use "one single cylinder actuator" to perform both functions, which was accomplished via a complex linkage arrangement that can move both buckets with a single cylinder. A0149, at 1:63-2:2; A0150, at 4:12-32. The Board likewise dismissed these unrebutted arguments. Its only pertinent reasoning was that the claims of the '489 Patent, some of which encompass multiple cylinders, were supposedly "obvious whether only a single cylinder is used or two cylinders are used." A0028-29. This completely misses the point of whether the combined teachings of Caterpillar and Ogawa would lead a PHOSITA to use two cylinders to

create the kind of two-blade movement claimed in the '489 Patent, and thus cannot support the Board's judgment.

For at least these reasons, substantial evidence does not support the Board's conclusion that the supposed modifications to Caterpillar would have been obvious to a PHOSITA.  Absent the roadmap of Allied's patent, the Board could not have envisioned such a redesign as obvious based on the knowledge of a PHOSITA at the time.  *See Ratti*, 270 F.2d at 813 ("Once appellant had taught how this could be done, *the redesign may, by hindsight, seem to be obvious* to one having ordinary skills in the shaft sealing art. However, when viewed as of the time appellant's invention was made, and without the benefit of appellant's disclosure, we find nothing in the art of record which suggests appellant's novel oil seal as defined in claims 1, 4, and 7.") (emphasis added).

2. *Making the Second Jaw Movable in Caterpillar Fundamentally Changes the Principle of Operation of Caterpillar*

When substantial reconstruction of the prior art is required to create the claimed invention, if that reconstruction changes the basic principles of operation of the prior art, a *prima facie* case of obviousness is lacking.  *Plas-Pak*, 2015 U.S. App. LEXIS 1456, at *5; *Ratti,* 270 F.2d at 813.

In *Plas-Pak*, the claimed invention was a device for mixing and applying multi-component coatings, such as paints.  2015 U.S. App. LEXIS 1456, at *2. There, a prior art reference, the Fukuta patent, included various pumps and stop

valves designed to prevent back-flow. *Id.* at *2-3. This Court affirmed the Board's decision not to combine Fukuta with other prior art where that combination would have "fundamentally alter[ed] that 'principle of operation.'" *Id.* at *7 (quoting *In re Mouttet*, 686 F.3d 1322, 1332 (Fed. Cir. 2012)). The Court explained that "replacing the valves and pumps of Fukuta's system with the cylindrical cartridges and mixing gun of Morris, which fail to achieve comparable backflow prevention, . . . fundamentally alters Fukuta's 'principle of operation.'" *Id.* at *7-8. Such a fundamental change to the prior art "is unlikely to motivate a [PHOSITA] to pursue a combination with that reference." *Id.* at *8; *see also Ratti*, 270 F.2d at 813 (holding that "the use of the resilient spring fingers of [the secondary prior art reference] could not possibly increase the resilient deformation" that is a core function of the primary prior art reference).

As in *Plas-Pak*, changing Caterpillar from having only a single moving jaw to having multiple moving jaws fundamentally changes the principle of operation. The simple attachment and detachment of the jaw in Caterpillar is accomplished expressly by connecting the lower jaw to the housing with two pins and a groove, preventing rotation. And it is by non-rotatably attaching one jaw to the housing that Caterpillar teaches it is able to have the swivel bearing "function[] only as the mutual swivel mounting of the two jaws and does not function as their attachment to the housing," in contrast to de Gier and Ogawa. A0134. Allowing a

modification of Caterpillar to fundamentally alter this fixed-jaw principle operation would be improper under *Plas-Pak*, and the need to make such fundamental changes by the Board to support its judgment is highly indicative of the nonobviousness of Allied's invention.

### 3. Making the Second Jaw Movable in Caterpillar as Suggested by the Board Renders the Device Inoperable

As noted above, a proposed combination cannot demonstrate obviousness unless the combination "would have worked for its intended purpose." *DePuy,* 567 F.3d at 1326. Put another way, "[i]f references taken in combination would produce a 'seemingly inoperative device,' . . . such references teach away from the combination and thus cannot serve as predicates for a prima facie case of obviousness." *McGinley*, 262 F.3d at 1354.

Here, the Board suggested only two ways that Caterpillar might be modified to allow both jaws to move: either (1) "provide another mounting structure like the lateral walls 13a"; or (2) "make[] the teeth portion of the first jaw 13 to be separately mounted to the swivel bearing 15, as taught by Ogawa." A0067. Neither purported combination will result in an operable device that remains suitable for its intended purpose, as Allied's unrebutted evidence shows.

First, Allied presented unrebutted evidence to the Board that adding a second mounting structure similar to the lateral walls would lead the support plates of the jaw and mounting structure to interfere with one another and prevent

50

rotation. A1347, at ¶ 18. As a result, either the support plate for the new mounting structure or the support plate for the jaw would need to be removed to allow the two components to rotate past each other. *Id.* at ¶ 19. This problem cannot be overcome to create an operable device. Removing the support plate from the new mounting system would remove all the critical lateral support. *Id.* at ¶ 19. Because the only thing holding the lateral walls of the new mounting structure to the housing (11) would be the pin-and-groove arrangement, without the critical lateral support holding the lateral walls of the new mounting structure together, "the opposing lateral walls would fall from the housing" and render the entire apparatus useless. *Id.*; *see also* A1349-50, at ¶ 31 (explaining that "the outward deflection from the lateral load would cause the lateral walls 13a to move outwardly . . . such that the blades . . . would likely become detached from the housing"). Mr. Ramun, the inventor of the '489 Patent having many years of experience in the demolition tool field, noted in his declaration that such as design is "unacceptabl[y] defective." *Id*.

On the other hand, if the support plate of the jaw (13) was removed, the jaw would be left with "inadequate structural support" to properly function in demolition applications. A1347, at ¶ 20; *see also* A1349, at ¶ 30 (explaining that "the jaws are subjected to significant lateral loads"). This catch-22 situation leads to an inoperable device either way, and thus the Board's proposed modification

cannot support an obviousness judgment. *See McGinley*, 262 F.3d at 1354 (finding nonobviousness where performing the proposed modification to the prior art "would require obliteration of . . . a feature that is necessary in order to permit the [prior art] invention to operate properly").

Safely and reliably addressing these structural problems is of paramount concern in a field where the tool sets typically weigh tens of thousands of pounds and must be designed to withstand thousands of tons of shear forces applied (for example, to crush concrete and cut through steel I-beams). This case is not about simple hand tools where structural trade-offs might easily and obviously made without sacrificing operability. Yet the Board was unreasonably dismissive of Allied's proof that the Board's proposed modifications created insurmountable structural issues.

The Board's second proposal for how to modify Caterpillar fares no better because it still yields the same interference problems discussed above. A1348-49, at ¶ 27. Even if the second blade of the jaw (13) could be mounted to pivot about the same swivel bearing (15), the interference that results "would be so limited that the device would be inoperable." *Id*. And again, after removing structural support to prevent interference, the same lateral forces at play would either cause the mounting apparatus to fall from the housing—an "unacceptabl[y] defective" design—or would leave the jaw without sufficient strength to perform its

demolition functions.  A1349-50, at ¶¶ 30, 31.  Moreover, pivotably mounting the blade to the swivel bearing, as the Board suggests, creates other practical problems, not the least of which being that the lone hydraulic cylinder has no way to engage with or drive the lower jaw, leaving it to swing freely about the swivel bearing and provide no useful force against the upper jaw.  *See* A1348, at ¶¶ 24-26.

Neither the Board nor Genesis relied on any evidence that rebuts the foregoing.  Genesis submitted a declaration from Daniel Jacobson, its Director of Engineering, but that declaration never addressed how the inoperability issues noted above can be overcome.  Mr. Jacobson expressed the conclusory opinion that the changes suggested by the Board were "basic modifications" within the skill level of a PHOSITA.  A1338, at ¶ 14.  Although he opined that "the selection or use of one or both pivoting blades in this art is a matter of engineering choice and does not constitute an innovation in the art," he never attempted to explain *how* one could make the lower jaw *in the Caterpillar reference* movable without making the device inoperable and/or changing its principle of operation.  A1337, at ¶¶ 10-12 (relying on U.S. Patent No. 5,044,569 to LaBounty for its high-level disclosure of both dual pivoting jaws and a single stationary jaw).  At most, Mr. Jacobson only suggested that a second hydraulic cylinder "could be readily added for actuating the jaw," but that bare suggestion fails to overcome the serious operability and structural issues presented by the modifications as a whole.  A1338, at ¶¶ 14-15.

Nor did Mr. Jacobson ever set forth facts for why the Board's specific proposed modifications, even if within the skill level of a PHOSITA, would have been obvious to a PHOSITA. He did not provide any reasons a PHOSITA would have made these changes based only on the knowledge available at the time of the invention, and without following the path of the Allied Patent's disclosure. This failure of proof cannot support a *prima facie* obviousness case when set against the unrebutted evidence of inoperability. *Cf. Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts . . . , or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.").

The Board similarly never truly grappled with the inoperability issues. Rather, the Board dismissed the significance of the evidence by merely suggesting that Allied failed to adequately combine the "teachings" of the prior art, and only combined the specific structures. A0027-30. Again, the Board failed to identify what "teachings" existed in the prior art that would avoid the inoperability demonstrated by Allied. It is not enough for the Board to simply deem Allied's evidence not "persuasive" when no countervailing evidence was presented. *Id.* at 19, 21. The absence of supporting evidence or reasoning from the Board again indicates the Board's improper hindsight and its failure to make its *prima facie* case.

## <u>CONCLUSION</u>

For the foregoing reasons, the decision of the PTAB finding all of claims 1-21 invalid for obviousness should be reversed.


Respectfully submitted,


Dated:  May 14, 2015          By:  <u>/s/ Daniel H. Brean</u>
                                   Richard L. Byrne
                                   James G. Porcelli
                                   Daniel H. Brean
                                   THE WEBB LAW FIRM
                                   One Gateway Center
                                   420 Fort Duquesne Blvd.
                                   Suite 1200
                                   Pittsburgh, PA 15222
                                   Telephone:  (412) 471-8815

                                   *Counsel for Appellant*

## **ADDENDUM**

1.   December 22, 2014 Decision on Request for Rehearing (A0001 – A0008)

2.   March 19, 2014 New Decision Under 37 C.F.R. § 41.77(f) (A0009 – A0035)

3.   September 4, 2012 Decision on Appeal (A0036 – A0075)



# UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/001,352 | 05/05/2010 | 7,121,489 | 15804-000001/US/RXA | 7638 |

28289        7590        12/22/2014
THE WEBB LAW FIRM, P.C.
ONE GATEWAY CENTER
420 FT. DUQUESNE BLVD, SUITE 1200
PITTSBURGH, PA 15222

| EXAMINER |
|---|
| ENGLISH, PETER C |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3993 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 12/22/2014 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

**A0001**

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

GENESIS ATTACHMENTS, LLC
Requester, Respondent

v.

ALLIED ERECTING AND DISMANTLING CO., INC., et al.
Patent Owner, Appellant

Appeal 2014-001006
*Inter partes* Reexamination Control 95/001,352
Patent US 7,121,489 B2
Technology Center 3900

*Before* JEFFREY B. ROBERTSON, DANIEL S. SONG and
RAE LYNN P. GUEST, *Administrative Patent Judges*.

SONG, *Administrative Patent Judge*

DECISION ON REQUEST FOR REHEARING

The Patent Owner filed a Request for Rehearing Pursuant to 37 C.F.R.
§ 41.79 requesting reconsideration of the New Decision Under 37 C.F.R.
§ 41.77(f) mailed March 19, 2014 (hereinafter "New Decision") which
rejects claims 1-21 of the '489 patent.

Appeal 2014-001006
Reexamination Control 95/001,352
Patent US 7,121,489 B2

We DENY the Patent Owner's request.

## ANALYSIS

The Patent Owner asserts that the New Decision is unsupported by substantial evidence and contrary to law because:

1.    The articulated reason for combining Ogawa with Caterpillar in order to allow the blades of Caterpillar "to be opened wider" lacks rational underpinnings (Req. 2–4);

2.    The articulated reason for combining Ogawa with Caterpillar in order to "minimize movement of the object[]" lacks rational underpinnings (Req. 2, 5–7);

3.    The Board improperly dismissed statements of the Requester regarding the asserted "long-felt need" (Req. 2, 7–9);

4.    The Board improperly dismissed evidence of copying (Req. 2, 9); and

5.    The Board's conclusion of obviousness was based on impermissible hindsight reconstruction (Req. 2, 9–10).

*Argument 1*

The Patent Owner asserts that the articulated reason for combining Ogawa with Caterpillar in order to "allow the blades to be opened wider" lacks rational underpinnings because a simpler way of making the blades of Caterpillar open wider is to make the movable jaw smaller as shown in Patent Owner's modified illustration of Fig. 3 of Caterpillar (*see* Req. 3-4).

2

Appeal 2014-001006
Reexamination Control 95/001,352
Patent US 7,121,489 B2

We initially note that the rationale of the Board was initially set forth in Appeal 2012-007030 (*see* Decision mailed September 4, 2014 (hereinafter "the '7030 Decision") 30) and was quoted and further explained in the New Decision in response to the Patent Owner's arguments that the Board failed to articulate a reason with rational underpinnings (New Decision 13-14).

As to the Patent Owner's argument regarding making the movable jaw smaller (Request 3-4), we observe that the existence of another alternative solution that would allow for wider opening does not negate the fact that such wider opening is attainable by combining the teachings of Caterpillar and Ogawa, or diminish the conclusion that such combination would have been obvious to one of ordinary skill in the art. As also explained,

> The record also establishes that it is well known in the art to provide tools with jaws wherein only one of the jaws is movable and the other is fixed (*see, e.g.*, '7030 Decision, FF2 E; FF5 A) or wherein both of the jaws are movable (*see, e.g.*, FF3 A; '7030 Decision, FF4 A).

(New Decision 13; *see also* New Decision 15-16).

Moreover, "the prior art itself clearly demonstrates that there exists a market for tools in which both of the jaws are movable (*see, e.g.*, FF3 A; '7030 Decision, FF4 A)." (New Decision 14). Thus, the Patent Owner's argument based on identification of an alternative solution is unpersuasive.

*Argument 2*

The Patent Owner asserts that the articulated reason for combining Ogawa with Caterpillar to "minimize movement of the object as it is grasped" lacks rational underpinnings because if "[t]he object is initially in contact with the fixed stationary blade and the moving blade alone . . .

3

Appeal 2014-001006
Reexamination Control 95/001,352
Patent US 7,121,489 B2

pivot[s] to contact the object," then "[t]he object does not move at all when it is grasped." (Req. 5-7, 14). This argument was also previously addressed (New Decision 16-17). Specifically, the Board stated:

> If only one of the blades is movable, the movable blade must displace the object until it abuts against the non-movable blade in order to grasp the object. *Whereas such movement of the object may be reduced by first abutting the non-movable blade against the object prior to moving the movable blade, . . . such positioning may not be attainable or desirable in all circumstances.*

(New Decision 17, emphasis added).

Moreover, as noted above with respect to *Argument 1*, the record is clear that jaws, wherein one or both of the blades move, are well known in the art. Thus, the Patent Owner's argument is unpersuasive.

### Argument 3

The Patent Owner argues that in the New Decision, the Board improperly dismissed statements of the Requester regarding the asserted "long-felt need." (Req. 7–9). However, this assertion is meritless because the Board already addressed this argument in detail (New Decision 21-22).

### Argument 4

The Patent Owner argues that the Board improperly dismissed evidence of copying, which includes the fact that the Requester was found liable to the Patent Owner for trade secret misappropriation and that the "misappropriated trade secrets of the Patent Owner used by Genesis to design their jaw set were some of the design details used for the internal

4

Appeal 2014-001006
Reexamination Control 95/001,352
Patent US 7,121,489 B2

elements of the jaw set that is the subject of the present reexamination proceeding." (Req. 9).

The trade secret argument was already addressed by the Board in the New Decision, which explained that such vague assertions regarding use of some unidentified "internal elements" of the jaw set do not persuasively establish nexus between the misappropriated trade secrets and the claimed invention (New Decision 22-23). The Patent Owner also argues in the Request for Rehearing that "from a cursory inspection, it can be seen that there are many similarities between the designs disclosed in the Genesis '718 patent and the design claimed in the Patent Owner's patent" (Req. 9). However, such vague assertions of "many similarities" are inadequate to demonstrate copying which

> may be demonstrated either through internal documents, *see Akamai Techs., Inc. v. Cable & Wireless Internet Servs., Inc.*, 344 F.3d 1186, 1196-97 (Fed. Cir. 2003); direct evidence such as disassembling a patented prototype, photographing its features, and using the photograph as a blueprint to build a virtually identical replica, *see Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1285 (Fed. Cir. 2000); or access to, and substantial similarity to, the patented product (as opposed to the patent), *Cable Elec. Prods., Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1027 (Fed. Cir. 1985), *overruled on other grounds by, Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356, 1359 (Fed. Cir. 1999) (en banc).

*Iron Grip Barbell Co. Inc. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004).

A0006

Appeal 2014-001006
Reexamination Control 95/001,352
Patent US 7,121,489 B2

*Argument 5*

Finally, the Patent Owner asserts that the Board's conclusion of obviousness was based on impermissible hindsight (Req. 9–10). However,

> Any judgment on obviousness is in a sense necessarily a reconstruction based on hindsight reasoning, but so long as it takes into account only knowledge which was within the level of ordinary skill [in the art] at the time the claimed invention was made and does not include knowledge gleaned only from applicant's disclosure, such a reconstruction is proper.

*In re McLaughlin*, 443 F.2d 1392, 1395 (CCPA 1971).

The Board's conclusion of obviousness set forth in the New Decision derives from proper consideration of the knowledge disclosed in the prior art of record and does not include knowledge gleaned only from the '489 patent. Reasons with rational underpinnings that support this conclusion are also set forth. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007).

## CONCLUSION

The Patent Owner's request to modify the New Decision is DENIED.

## DENIED

Pursuant to 37 C.F.R. § 41.79(d), this decision is final for the purpose of judicial review. A party seeking judicial review must timely serve notice on the Director of the United States Patent and Trademark Office. *See* 37 C.F.R. §§ 90.1 and 1.983.

6

Appeal 2014-001006
Reexamination Control 95/001,352
Patent US 7,121,489 B2


cc:

Patent Owner:
THE WEBB LAW FIRM, P.C.
ONE GATEWAY CENTER
420 FT. DUQUESNE BLVD, SUITE 1200
PITTSBURGH, PA 15222

Third Party Requestor:
HARNESS, DICKEY & PIERCE, P.L.C.
P.O. BOX 828
BLOOMFIELD HILLS, MI 48303

 UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/001,352 | 05/05/2010 | 7,121,489 | 15804-000001/US/RXA | 7638 |

28289        7590        03/19/2014
THE WEBB LAW FIRM, P.C.
ONE GATEWAY CENTER
420 FT. DUQUESNE BLVD, SUITE 1200
PITTSBURGH, PA 15222

| EXAMINER |
|---|
| ENGLISH, PETER C |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3993 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 03/19/2014 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES

———————————

GENESIS ATTACHMENTS, LLC
Requester, Respondent

v.

ALLIED ERECTING AND DISMANTLING CO., INC., et al.
Patent Owner, Appellant

———————————

Appeal 2014-001006
*Inter partes* Reexamination Control 95/001,352
Patent US 7,121,489 B2[1]
Technology Center 3900

———————————

*Before* JEFFREY B. ROBERTSON, DANIEL S. SONG and
RAE LYNN P. GUEST, *Administrative Patent Judges*.

SONG, *Administrative Patent Judge*

NEW DECISION UNDER 37 C.F.R. § 41.77(f)

———————————

[1] Patent US 7,121,489 B2 (hereinafter "'489 patent") issued October 17, 2006 to Ramun.

Appeal 2014-001006
Reexamination Control 95/001,352
Patent US 7,121,489 B2

## STATEMENT OF THE CASE

The '489 patent of the present appeal was the subject of *inter partes* reexamination Appeal 20120-007030 (hereinafter "'7030 Appeal") for which the Board's decision was mailed on September 4, 2012 (hereinafter "'7030 Decision").[2] In the '7030 Appeal, the Requester appealed the Examiner's patentability determinations of claims 1-21 and the Examiner's decision to not adopt 9 rejections proposed by the Requester. The Board affirmed the Examiner's decision to not adopt 7 of the 9 proposed rejections, reversed the Examiner's decision not to adopt a proposed obviousness rejection of claims 1-3, 13-14 and 17-20, and remanded the case to the Examiner for further consideration of the remaining proposed rejection for dependent claims 4-12, 15, 16 and 21 ('7030 Decision 36-37). Pursuant to 37 C.F.R. § 41.77(a)-(b), the decision to reverse the Examiner's patentability determination was designated as a "new ground of rejection." (*Id.*).

The Patent Owner opted to reopen prosecution pursuant to 37 C.F.R. § 41.77(b)(1) in its Response to Decision on Appeal on October 18, 2012 (hereinafter "Resp. to Decision"), submitting arguments and amendments to independent claims 1, 7, 17-19 to recite that the bridge housing is separate from the movable blades (Resp. to Decision 3-7). Independent claims 20 and 21 were not amended. The Patent Owner also submitted a declaration from the inventor Mr. Ramun (hereinafter "Second Decl. of Ramun") with exhibits in support of its arguments. The Requester

---

[2] The '7030 Decision was issued by the Board of Patent Appeals and Interferences which has since been renamed as the Patent Trial and Appeal Board.

A0011

Appeal 2014-001006
Reexamination Control 95/001,352
Patent US 7,121,489 B2

filed its Requester's Comments on the Patent Owner Response on November 15, 2012 with a declaration from Mr. Jacobson (hereinafter "Decl. of Jacobson") and exhibits in rebuttal. The Board granted the request to reopen prosecution on January 31, 20013 in the Order Remanding Inter Partes Reexamination Under 37 C.F.R. § 41.77(d).

The Examiner issued a Determination Pursuant to 37 C.F.R. § 41.77(d) on February 15, 2013 (hereinafter "Determination") stating that the Patent Owner has not overcome the New Ground of Rejection of the '7030 Decision and adopting the rejection remanded for reconsideration, thereby determining that all of the claims 1-21 are unpatentable (Determination 9-10). The Patent Owner filed Comments in Response to the Examiner's Determination on March 15, 2013 (hereinafter "PO Comm.") arguing patentability of the claims. The Requester filed Third Party Requester's Comments on the Patent Owner's Response to Examiner's Determination on April 10, 2013 (hereinafter "Req. Comm.") in support of rejecting the claims. The case has been returned to the Board for reconsideration and a New Decision under 37 C.F.R. § 41.77(f).

As discussed *infra*, the Patent Owner's amendments, arguments and submitted evidence are inadequate to establish patentability of claims 1-21. Hence, claims 1-21 remain rejected as follows:

1.      Claims 1-3, 13-14 and 17-20 stand rejected under 35 U.S.C. § 103 as obvious over Caterpillar in view of Ogawa.

2.      Claims 4-12, 15, 16 and 21 stand rejected under 35 U.S.C. § 103 as obvious over Caterpillar in view of Ogawa and Clark.

3

Appeal 2014-001006
Reexamination Control 95/001,352
Patent US 7,121,489 B2

In rejecting claims 1-21, we incorporate by reference the '7030
Decision in its entirety but reproduce and refer to portions thereof *infra*.

## FINDINGS OF FACT

Findings of Fact 1, 3 and 5 are reproduced herein below for
convenience ('7030 Decision 3-5, 14-35).

*The Invention*

FF1.  A.  The '489 patent is directed to a tool attachment system which
allows different tools such as hydraulically actuated metal cutting shears,
concrete crushers, and grapples that have movable jaws to be attached to
equipment such as backhoes (Abstract; col. 1, ll. 20-26).

B.  Figure 2 of the '489 patent is reproduced below.



FIG. 2

Figure 2 of the '489 patent reproduced above illustrates a side view of
a shear 10' including a first blade 12 and a second blade 14 pivotally
connected at a main pin 16 to a universal body 18' (col. 3, ll. 55-56; col. 5, ll.
57-59; col. 6, ll. 18-23; Fig. 2).

4

Appeal 2014-001006
Reexamination Control 95/001,352
Patent US 7,121,489 B2

C.  The specification of the '489 patent states "[a] bridge housing 48 surrounds the main pin 16 and is utilized for quickly and easily attaching the main pin 16 and the associated jaw set to the universal body 18."  (Col. 6, ll. 56-59).

D.  Figure 57 of the '489 patent is reproduced below.



FIG. 57

Figure 57 of the '489 patent reproduced above illustrates a perspective view of the quick release system including bridge housing 48 that is positioned against the receiving member 42 and secured thereto by keeper pins 50 which are inserted through the apertures 52 of the bridge housing 48 and the receiving member 42 (col. 5, ll. 46-47; Certificate of Correction dated October 17, 2006, inserting originally filed paragraph [0081]; Fig. 57).

E.  The specification of the '489 patent teaches that the advantage of the claimed invention is that "the outer bearing structure surrounding the main pin 16 will remain affixed even when the tool unit is removed from the universal body 18.  This provides the advantage that the bearing or rotating surfaces will be protected from dirt and grit even when the tool unit is disassembled."  (Col. 6, l. 67-col. 7, l. 5).

F.  Figures 8 and 9 of the '489 patent are reproduced below.

5

Appeal 2014-001006
Reexamination Control 95/001,352
Patent US 7,121,489 B2



FIG. 8                    FIG. 9

Figure 8 of the '489 patent reproduced above is a partial sectional view of the shear and the components of the bridge housing 48 with the main pin 16 received therein while Figure 9 illustrates the disassembly of the tool unit (col. 4, ll. 1-6; Fig. 8).

   G.   In discussing the bridge housing 48, the specification of the '489 patent states that "the first end 400 of the bridge housing 48 has a sleeve 408 between the two opposing plates 405, 406," and discloses that the sleeve 408 has a support surface 410 (not shown) (Col. 7, ll. 27-30; see also col. 7, ll. 38-40).  Hence, the specification and the illustration of Figure 8 of the '489 patent indicates that the "bridge housing" is an assembly of components.

   *Ogawa*[3]

FF3.   A.   Ogawa discloses a convertible bucket attachment for excavation and clasping (Abst.).   Figure 4a of Ogawa is reproduced below:

---

[3] U.S. Patent No. 4,283,866 issued August 18, 1981 to Ogawa.

A0015

Appeal 2014-001006
Reexamination Control 95/001,352
Patent US 7,121,489 B2



FIG. 4a

Figure 4a reproduced above shows a side view of the bucket attachment in according to one embodiment including bucket proper 1 and a sub-bucket 2 that are pivotally engaged by pin 5' on arm 11 so that both of the buckets pivot upon actuation of a cylinder actuator 13 (col. 2, l. 59-col. 3, l. 10; Fig. 4a).

B.   In discussing a prior art bucket apparatus, Ogawa states that "provision of a cylinder actuator between the back and the fore bucket has imposed a substantial limitation on the distance of range in which both bucket members can be operatively moved relative to each other, and prevented the range of angular movement of the members from being as wide as 180° as in the embodiment of the invention." (Col. 1, ll. 49-55).

C.   Figures 6 and 7 of Ogawa are reproduced below:



FIG. 6        FIG. 7

7

Appeal 2014-001006
Reexamination Control 95/001,352
Patent US 7,121,489 B2

Figure 6 shows a side view while Figure 7 shows a plan view, respectively, of a modified embodiment of a bucket attachment including bucket proper 1 having stay 4, sub-bucket 2, pin 5', sub-link members 14, upper link members 16, and bracket 9 which is used to secure the bucket portion to the arm 11 (col. 3, l. 62-col. 4, l. 9). Stay 4 of bucket proper 1 is not attached to bracket 9 (Figs. 6 and 7).

*Caterpillar*[4]

FF5.   A.   Caterpillar discloses a demolition shear such as a scrap metal shear (Pg. 5). Figures 1 and 2 of Caterpillar are reproduced below.



---

[4] German reference DE 297 15 490 U 1 dated August 29, 1997 (hereinafter "Caterpillar"; citations to English translation of record).

A0017

Appeal 2014-001006
Reexamination Control 95/001,352
Patent US 7,121,489 B2

Figure 1 of Caterpillar reproduced above shows a lateral view of a scrap metal shear 10 with its jaws removed (Pg. 5; Fig. 1). Figure 2 of Caterpillar reproduced above shows a frontal, partial cross-sectional view of the scrap metal shear of Figure 1 (Pg. 5; Fig. 2).

B. Caterpillar discloses that scrap metal shear 10 has a housing 11 to which first jaw 13 and second jaw 14 are attached, the second jaw being pivotally mounted via swivel bearing 15 and operable via a hydraulic cylinder 16 (Pg. 6; Figs. 1 and 2).

C. Figure 1 of Caterpillar illustrates that when the jaws of the scrap metal shear 10 is removed, the swivel bearing 15 remains pivotally connecting the first jaw 13 and the second jaw 14 together (Fig. 1).

D. Caterpillar discloses that the first jaw 13 includes a pair of opposing lateral walls 13a having holding fixtures 19 and 20 which are used to attach the first jaw 13 to the housing 11, the holding fixture 19 including grooves 22 with receptacle section 22b in the lateral wall 13a for receiving a pin 21, 21a, and holding fixture 20 including a bore hole 23 in the lateral wall 13a for receiving a locking pin 25 (Pg. 6-7).

E. Figure 1 of Caterpillar also illustrates that the swivel bearing 15 is mounted via lateral walls 13a (Fig. 1).

F. Figures 1 and 2 of Caterpillar further illustrates that the lateral walls 13a are distinct structures of the first jaw 13 made as a bracket plate that is attached transversely spaced from the remainder of the first jaw which includes the teeth portion (Figs. 1 and 2).

G. Caterpillar teaches that the holding fixtures 19 and 20 with grooves 22 and bore hole 23 in the lateral walls 13a allow for disassembly

A0018

Appeal 2014-001006
Reexamination Control 95/001,352
Patent US 7,121,489 B2

"in [a] simple fashion" by merely pulling the locking pin 25 out of the bore

holes 23." (Pg. 7).


### THE '7030 DECISION

In the '7030 Decision, the Board reversed the Examiner's refusal to

adopt a proposed rejection of claims 1-3, 13, 14 and 17-20 for being obvious

over the combination of Caterpillar and Ogawa (*see generally*, '7030

Decision 28-32). The Board found that Caterpillar

> disclose[s] a "bridge housing" as recited by the claims in that
> the side walls 13a are distinct, discernible structures, and the
> side walls 13a serves the function of allowing the jaws to "be
> removed from or attached to the body without the need to
> disengage or engage the main pivot pin from the blades, thereby
> providing a quick release system for attaching the tool set to the
> body" as recited by the claims and described in the
> Specification of the '489 patent (FF5 A-G).

('7030 Decision 27).

The Board also found that Caterpillar "teaches one of ordinary skill in

the art the desirability of simplifying disassembly of jaws, and discloses a

mechanism for doing so in the lateral walls 13a having holding fixtures 19

and 20 (FF5 A, D-G)." ('7030 Decision 29; FF5 A, D-G). The Board

further found that Ogawa establishes that providing two movable blades are

known, and that Ogawa "also specifically discloses the provision of wide

range of angular movement (FF3 A)." ('7030 Decision 30; FF3 A).

Based on the above findings, the Board concluded that the Requester

has articulated a rational reason for modifying Caterpillar, that is, to make

the blade 13 pivotable about the existing pivot pin 15 so as to allow the

blades to be opened wider ('7030 Decision 30). The Board further

10

Appeal 2014-001006
Reexamination Control 95/001,352
Patent US 7,121,489 B2

articulated that pivotable mounting of the first blade 13 in Caterpillar would "allow for minimizing movement of the object grasped since the object would be grasped on opposing sides thereof by moveable blades rather than a single moving blade which applies grasping force from only one side until the object abuts the non-movable blade." (*Id.*). The Board concluded that:

> [I]t would have been obvious to one of ordinary skill in the art to apply the teaching of Ogawa with respect to articulation of both grasping members and wide range of angular movement to thereby modify Caterpillar so that the first jaw 13 with the teeth thereon also pivots about the swivel bearing 15 like second jaw 14, while also maintaining the simplified mounting and disassembly via the lateral walls 13a with their holding fixtures 19, 20 so that the jaws can be disassembled in a simple manner as specifically taught therein (FF5 D). In our view, it would be apparent and within the skill of one of ordinary skill in the art that such modification to the device of Caterpillar may be attained, and within his/her skill to, for example, provide another mounting structure like the lateral walls 13a, or alternatively, making the teeth portion of the first jaw 13 to be separately mounted to the swivel bearing 15, as taught by Ogawa. While the above suggested modification to Caterpillar would entail design and structural changes, we observe that it is not necessary that the inventions of the references must be physically combinable, without change, to render obvious the invention under review. *In re Sneed*, 710 F.2d 1544, 1550 (Fed. Cir. 1983); *see also In re Keller*, 642 F.2d 413, 425 (CCPA 1981)."

('7030 Decision 30-31).


## AMENDED CLAIMS

Representative independent claim 1, as amended after the '7030 Decision, reads as follows (Resp. to Decision 3):

Appeal 2014-001006
Reexamination Control 95/001,352
Patent US 7,121,489 B2

     1. (Twice Amended) A tool set for coupling to the receiving member of a body having hydraulically powered blades, the tool set comprising:
     a pair of movable blades pivoted together about a main pivot pin;
     a bridge housing [engaging]encasing the main pivot pin, wherein the bridge housing is separate from the movable blades;
     wherein the blades are movable relative to the bridge housing;
     wherein the bridge housing with the main pivot pin intact therein is adapted to be detachably connected to the receiving member and the pair of movable blades is adapted to be detachably connected to at least one hydraulic cylinder such that the tool set may be removed from or attached to the body without the need to disengage or engage the main pivot pin from the blades, thereby providing a quick release system for attaching the tool set to the body; and
     wherein the bridge housing has an aperture adapted to be mated with a matching aperture of the receiving member through a removable keeper pin to secure the bridge housing to the receiving member.

Independent claims 7 and 17-19 have also been amended to recite that the bridge housing is separate from the movable blades, but independent claims 20 and 21 were not amended (Resp. to Decision 3-9).


## ANALYSIS

The Examiner states that the Patent Owner has failed to overcome the New Ground of Rejection as articulated by the Board in the '7030 Decision (Determination 9). The Patent Owner disagrees for various reasons (PO Comm. 2) which we address *infra*.

A0021

Appeal 2014-001006
Reexamination Control 95/001,352
Patent US 7,121,489 B2

*Articulated Reason*

The Patent Owner argues that the Board failed to articulate a reason with rational underpinnings to support the obviousness conclusion and, thus, engaged in impermissible hindsight (PO Comm. 2). The Patent Owner asserts that there is no apparent reason to modify Caterpillar because there is nothing in the record which establishes that Caterpillar was inadequate for any intended purpose and there is no evidence establishing "'demands known to the design community or present in the marketplace.'" (PO Comm. 4) (quoting *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007)).

Obviousness analysis requires a determination that "there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue" which is substantiated by an articulated reasoning with rational underpinnings. *KSR*, 550 U.S. at 418. The bridge housing of the '489 patent allows the tool to be removed or attached without disengaging or engaging the main pivot pin, thereby protecting the rotating surfaces from dirt and grit when the tool is removed (FF5 C, E). However, providing a bridge housing is not new and is disclosed by Caterpillar, which also specifically teaches that the described device allows for disassembly "'in [a] simple fashion' by merely pulling the locking pin 25 out of the bore holes 23." (FF5 A-G). The record also establishes that it is well known in the art to provide tools with jaws wherein only one of the jaws is movable and the other is fixed (*see, e.g.*, '7030 Decision, FF2 E; FF5 A) or wherein both of the jaws are movable (*see, e.g.*, FF3 A; '7030 Decision, FF4 A). Hence, the Board concluded that "it would have been obvious to . . . apply the teachings of Ogawa with respect to articulation of both grasping members and wide

13

Appeal 2014-001006
Reexamination Control 95/001,352
Patent US 7,121,489 B2

range of angular movement to thereby modify Caterpillar" to allow the blades to be opened wider or to minimize movement of the object as it is grasped ('7030 Decision 30). Correspondingly, contrary to the assertion of the Patent Owner, reasons with rational underpinnings have been articulated.

The Patent Owner's arguments based on the assertion that there is lack of evidence regarding "demands" to modify the device of Caterpillar or regarding deficiencies in the same are also unpersuasive. As noted, the prior art itself clearly demonstrates that there exists a market for tools in which both of the jaws are movable (*see, e.g.*, FF3 A; '7030 Decision, FF4 A). In this regard, the Requester has submitted further evidence in Rafn '242,[5] LaBounty '493,[6] and LaBounty '569[7] as rebuttal to the Patent Owner's assertions which "clearly support the conclusion that for some applications within this art, it is desirable to make both blades movable." (Req. Comm. 6; Decl. of Jacobson ¶¶ 9-11). In addition to the desirability of allowing disassembly in a simple fashion (FF5 A), the evidence of record further suggests the advantage and desirability of allowing for wide openings (FF3 B). Thus, the evidence suggests to one of ordinary skill familiar with all of the pertinent prior art to combine these references to attain the suggested benefits therein, regardless of the absence of explicit disclosure of any deficiency in the Caterpillar device. *See KSR*, 550 U.S. at 417 ("[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is

---

[5] U.S. Patent No. 5,474,242 issued December 12, 1995 to Rafn.
[6] U.S. Patent No. 4,838,493 issued June 13, 1989 to LaBounty.
[7] U.S. Patent No. 5,044,569 issued September 3, 1991 to LaBounty.

A0023

Appeal 2014-001006
Reexamination Control 95/001,352
Patent US 7,121,489 B2

beyond his or her skill."); *see also Custom Accessories*, *Inc. v. Jeffrey-Allan Industries, Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986) ("The person of ordinary skill is a hypothetical person who is presumed to be aware of all the pertinent prior art."); *In re Antle*, 444 F.2d 1168, 1171-72 (CCPA 1971). Correspondingly, we disagree with the Patent Owner that there is an evidentiary deficiency in the record.

The Patent Owner also argues that to achieve wider opening, Ogawa utilizes a complex linkage arrangement and application to the device of Caterpillar that requires "modification of the housing 11 . . . to make room for the links," and "add[s] complexity and a potential source of weakness, diminishing the original rugged design." (PO Comm. 4-5). Firstly, we observe that the Patent Owner does not present persuasive evidence to establish that the level of complexity is so high that it would be beyond the skill of a person of ordinary skill in the art to modify Caterpillar accordingly. To the contrary, the prior art of record demonstrates that the skill level in the art is high. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001); *Union Carbide Corp. v. American Can Co.*, 724 F.2d 1567, 1573 (Fed. Cir. 1984). In this regard, we further note that LaBounty '493 submitted by the Requester in rebuttal to the Patent Owner's assertions discloses that "in some instances, the brace 27 may be replaced by an extensible connection 27.1 illustrated in phantom lines in Figure 6 and may be in the form of a hydraulic cylinder so that the orientation of the lower jaw 17 may be adjustable." (LaBounty '493, col. 3, ll. 23-27; Fig. 6; *see also* Req. Comm. 5; Decl. of Jacobson ¶ 10). Thus, the prior art of record generally, and LaBounty '493 specifically, demonstrates not only the high level of skill of

15

Appeal 2014-001006
Reexamination Control 95/001,352
Patent US 7,121,489 B2

one of ordinary skill in the art as to the ability to alter jaws but also
demonstrates that implementing a jaw so that one or both blades are
movable is a design choice that is well within the skill of one of ordinary
skill.

Furthermore, even if the Patent Owner's assertion that addition of
links introduces disadvantages because it would add complexity and
potential source of weakness is true, such disadvantages does not necessarily
render such combination improper. *See Medichem, S.A. v. Rolabo, S.L.*, 437
F.3d 1157, 1165 (Fed. Cir. 2006) ("a given course of action often has
simultaneous advantages and disadvantages, and this does not necessarily
obviate motivation to combine."); *see also Winner Int'l Royalty Corp. v.
Wang*, 202 F.3d 1340, 1349 n. 8 (Fed. Cir. 2000) ("The fact that the
motivating benefit comes at the expense of another benefit, however, should
not nullify its use as a basis to modify the disclosure of one reference with
the teachings of another.  Instead, the benefits, both lost and gained, should
be weighed against one another.").  In our view, one of ordinary skill in the
art would take such factors into consideration and conclude that for certain
applications, the benefits of allowing for wide opening and minimizing
movement of the grasped object would outweigh the potential disadvantages
asserted by the Patent Owner.  The Patent Owner has not provided
persuasive evidence or arguments to the contrary.

The Patent Owner also argues that the benefit of minimizing
movement of the object as articulated in the '7030 Decision as another
reason for combining the references already exists in Caterpillar without
further modification (PO Comm. 5).  According to the Patent Owner,

16

Appeal 2014-001006
Reexamination Control 95/001,352
Patent US 7,121,489 B2

because the device of Caterpillar includes "a rotatable connection head 12 that may be rotated about an axis A" which is connected to an articulating hydraulic excavator, there is no need for dual movable jaws. (PO Comm. 5).

The Patent Owner misapprehends the reason as articulated by the Board which was that the movable blades "allow for minimizing movement of the object grasped since the object would be grasped on opposing sides thereof by moveable blades rather than a single moving blade which applies grasping force from only one side until the object abuts the non-movable blade." ('7030 Decision 30). Thus, the advantage of the movable blades stems from being able to grasp the object positioned in the opening between the two blades by progressively reducing the opening through the simultaneous movement of the two blades. If only one of the blades is movable, the movable blade must displace the object until it abuts against the non-movable blade in order to grasp the object. Whereas such movement of the object may be reduced by first abutting the non-movable blade against the object prior to moving the movable blade, and such positioning may be facilitated by the articulating arm, such positioning may not be attainable or desirable in all circumstances. The rotatable connection head of Caterpillar, while allowing for angular positioning of the blades, does not directly address the aspect of the positioning discussed above.

The Patent Owner further argues that the reason articulated by the Requester for the desirability of the combination, that is, to allow exertion of a greater force, "appears to be impossible" in view of the fact that Ogawa's device has various intermediate linkages (PO Comm. 5-6). However, this rationale was proffered by the Requester, not by the Board. The Board did

Appeal 2014-001006
Reexamination Control 95/001,352
Patent US 7,121,489 B2

not adopt this rationale in entering the rejection. Hence, this argument of the Patent Owner is moot.

The Patent Owner notes that it has "submitted Attachments E-G showing a number of speculative combinations, including View 2(A), none of which was believed to be obvious or operative." (PO Comm. 6; Second Decl. of Ramun, Attachments E-G). According to the Patent Owner, the Requester's Modified View 2(A) is deficient to attain the benefits articulated as the basis for the combination (PO Comm. 7). However, we observe that Modified View 2(A) was submitted by the Requester (Decl. of Jacobson ¶14) in response to the numerous attachments in the Second Declaration of Ramun, and the Board did not rely on the Modified View 2(A) in its entry of the New Ground of Rejection.

To any extent that the various views set forth in the Declaration of Ramun (and in the Declaration of Jacobson) may be pertinent, as conceded by the Patent Owner, the various combinations are merely speculative. We also observe that the Patent Owner's arguments are based on bodily incorporating the teachings of Ogawa into the device of Caterpillar (*see generally*, Second Decl. of Ramun ¶¶ 13-31). In this regard, asserting inoperability, the Patent Owner attacks Requester's Modified View 2(A) as if it is an actual implementation of the combination based on engineering drawings that are sized to scale (*see* PO Comm. 6-7). However, such bodily incorporation using drawings of a patent is not the proper inquiry. *See In re Nievelt*, 482 F.2d 965, 968 (CCPA 1973) ("Combining the *teachings* of references does not involve an ability to combine their specific structures."); *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907 (Fed. Cir. 1985)

A0027

Appeal 2014-001006
Reexamination Control 95/001,352
Patent US 7,121,489 B2

("A reference must be considered for everything it *teaches* by way of technology and is not limited to the particular *invention* it is describing and attempting to protect.  On the issue of obviousness, the combined teachings of the prior art as a whole must be considered."); *see also In re Heck*, 699 F.2d 1331, 1332-33 (Fed. Cir. 1983).

Rather, the proper analysis in determining patentability is whether it would have been obvious to one of ordinary skill in the art to combine the references for the reason articulated and whether the reason has sound rational underpinnings.  *KSR*, 550 U.S. at 418; *In re Keller*, 642 F.2d 413, 425 (CCPA 1981) ("[T]he test [for obviousness] is what the combined teachings of the references would have suggested to those of ordinary skill in the art.").  As noted, the Patent Owner does not present persuasive evidence or arguments to establish that implementing the suggested combination in an operable manner would be beyond the skill of a person of ordinary skill in the art which is demonstrably high.  *See Okajima*, 261 F.3d at 1355; *Union Carbide*, 724 F.2d at 1573.

*Ogawa Teaches Away*

The Patent Owner argues that Ogawa teaches away from the modifications shown in Modified View 2(A) to the device of Caterpillar because it discloses that an object is to use a single cylinder and discusses the need for two separate cylinders in the prior art (PO Comm. 2, 9).  However, this line of argument is not persuasive because as discussed *supra*, Modified View 2(A) with its inclusion of two hydraulic cylinders is not the basis of the '7030 Decision.  In entering the obviousness rejection based on

19

Appeal 2014-001006
Reexamination Control 95/001,352
Patent US 7,121,489 B2

the combination of Caterpillar and Ogawa, the Board considered not only the particular invention described, but what these references teach by way of technology. *EWP*, 755 F.2d at 907. In this regard, we also note that claims of the '489 patent actually recite "at least one hydraulic cylinder" except for dependent claim 13 which recites "a single hydraulic cylinder." Claim 13 was also rejected as obvious because this feature is clearly disclosed in Caterpillar and Ogawa ('7030 Decision 32). Thus, the conclusion of the '7030 Decision is that the claims of the '489 patent are obvious whether only a single cylinder is used or two cylinders are used. The Patent Owner's additional inoperability arguments based on the Requester's Modified View 2(A) (PO Comm. 9) are unpersuasive for the reasons discussed *supra*.

*Reconstruction*

The Patent Owner argues that the suggested modification to Caterpillar is a complete reconstruction that does not function (PO Comm. 2). The Patent Owner argues that the following modifications are required to the Caterpillar device:

1.  separate the side walls 13a from the jaw 13;

2.  provide a new pivot hole for the separated jaw 13;

3.  add a second hydraulic cylinder;

4.  provide a hole in the separated jaw 13 for the hydraulic cylinder;

5.  provide a connecting arm for the hole of the separated jaw 13; and

6.  provide a mount for the second hydraulic cylinder.

(PO Comm. 10).

20

Appeal 2014-001006
Reexamination Control 95/001,352
Patent US 7,121,489 B2

However, as reproduced *supra*, "[w]hile the . . . suggested modification to Caterpillar would entail design and structural changes, we observe that it is not necessary that the inventions of the references must be physically combinable, without change, to render obvious the invention under review. *In re Sneed*, 710 F.2d 1544, 1550 (Fed. Cir. 1983); *see also In re Keller*, 642 F.2d 413, 425 (CCPA 1981)." ('7030 Decision 31). The modifications identified by the Requester appear to be routine and well within the skill of one of ordinary skill in the art, which is demonstrably high. The Patent Owner does not present persuasive evidence to establish that the identified modifications or implementing the suggested combination in an operable manner via alternative modifications would be beyond the skill of a person of ordinary skill in the art. The Patent Owner's additional inoperability arguments based on the Requester's Modified View 2(A) (PO Comm. 11-12) are unpersuasive for the reasons discussed *supra*.

### *Declaration of Jacobson*

The Patent Owner argues that the Declaration of Jacobson is contrary to the prior actions of the Requester and should be discounted (PO Comm. 3). The Patent Owner notes that Mr. Jacobson was a Director of Engineering at Genesis (i.e., the Requester) and the inventor of U.S. Patent No. 7,284,718 which states "[t]here is a need for a heavy duty demolition shear with interchangeable jaw assemblies that can be easily mounted an[d] demounted to the apparatus." (PO Comm. 14, *quoting* '718 patent, col. 1, ll. 65-67). Hence, the Patent Owner asserts that the Requester has admitted existence of a "long-felt need." (PO Comm. 16). The Requester also asserts

21

Appeal 2014-001006
Reexamination Control 95/001,352
Patent US 7,121,489 B2

that because Genesis failed to arrive at a design similar to that disclosed in the '489 patent until year 2005, this indicates that the claims of the '489 patent are not obvious and it is contradictory for Mr. Jacobson to assert obviousness when such design eluded Mr. Jacobson until year 2005 even though he had extensive experience in the industry (PO Comm. 14-15).

Firstly, we note that Jacobson Declaration is not dispositive as to our conclusion of obviousness with respect to the claims of the '489 patent. Secondly, while it may be argued that the identified statement in U.S. Patent No. 7,284,718 is evidence of non-obviousness, it is merely one piece of evidence that must be considered with all of the evidence of record which has been discussed *supra*.  In addition, long-felt need requires showing the existence of a persistent problem recognized by those of ordinary skill in the art for which a solution was not known.  *In re Gershon*, 372 F.2d 535, 539 (CCPA 1967).  As noted, the solution to the problem addressed by the '489 patent was already known in the art (FF5 A).  Moreover, while providing for such a feature may not have been obvious to Mr. Jacobson at the time the application for U.S. Patent No. 7,284,718 was filed, the issue is whether it would have been obvious to a person of ordinary skill in the art who would have been aware of all of the pertinent prior art, including those in the present record. *See Custom Accessories*, 807 F.2d at 962 ("The person of ordinary skill is a hypothetical person who is presumed to be aware of all the pertinent prior art.  The actual inventor's skill is not determinative.").

The Patent Owner further argues that Genesis (i.e., the Requester) was found liable to the Patent Owner for trade secret misappropriation in a court action and that the "misappropriated trade secrets used by Genesis to design

Appeal 2014-001006
Reexamination Control 95/001,352
Patent US 7,121,489 B2

their jaw set were some of the design details used for the internal elements of the jaw set that is the subject of the present reexamination proceeding." (PO Comm. 15).  However, the Patent Owner does not provide adequate details as to the nexus between the misappropriated trade secrets and the claimed invention of the '489 patent which would allow us to evaluate the pertinence of the trade secret misappropriation, if any.

*Amendments to the Claims*

The Patent Owner asserts that because independent claims 1, 7 and 17-19 have been amended as suggested by the Board to clearly distinguish over the prior art of record, the rejections have been overcome (PO Comm. 3, 16-17, *citing* '7030 Decision 27-28).  The Patent Owner misapprehends the record.  The '7030 Decision states:

> While the side walls 13a are attached to the remaining structure of the first jaw 13, we do not consider the claims to require physical independence or separation.  To the extent that physical independence or separation from a jaw was the intended meaning of the limitation, the Patent Owner has had an adequate opportunity to amend the claims accordingly.

('7030 Decision 27-28).

The above excerpt addresses the *anticipation* rejection of claims 20 and 21, this anticipation rejection being reversed because Caterpillar does not disclose "a pair of movable blades pivoted together about a main pivot pin." (*Id.* at 28; *see also* Req. Comm. 17-18).  Whereas such amended language may have overcome the anticipation rejection because the side walls 13a of Caterpillar are attached to the first jaw 13, the amended language does not overcome the obviousness rejection based on the

23

Appeal 2014-001006
Reexamination Control 95/001,352
Patent US 7,121,489 B2

combination of Caterpillar and Ogawa (*id.* at 28-32).  As explained by the Examiner, "in modifying Caterpillar in view of Ogawa, the BPAI has determined that the resulting combination would include a modified first jaw 13 that is 'separate from' the lateral walls 13a (which constitute the claimed 'bridge housing')."  (Determination 9).

*Claims 4-12, 15-16 and 21*

These claims require "removable keeper pins to secure the bridge housing to the receiving member."  (*See, e.g.*, claim 4).  The Examiner determined that these claims are unpatentable over the combination of Caterpillar in view of Ogawa and Clark and adopted the rejection remanded for reconsideration (Determination 10).  The Examiner agrees with the Requester's finding that Clark discloses a pair of remote-controlled retractable pins that engage apertures to securely engage a bucket to a receiving member and concluding that these claims would have been obvious to a person of ordinary skill based on Clark's express teaching that its retractable pin system is an improvement over manually inserted pins (Determination 7-8, 10; *see also* Clark, col. 2, l. 63-col. 3, l. 9).

In addition to relying on the unpersuasive arguments addressed *supra* (PO Comm. 18), the Patent Owner argues that "the pin arrangement disclosed in Clark is directed to a terminal piece of equipment, such as, for example, the bucket 4 illustrated in Figs. 1-3," which is "fundamentally different from the subject invention" that uses pins to secure a separate and distinct bridge housing (PO Comm. 17-18).

24

Appeal 2014-001006
Reexamination Control 95/001,352
Patent US 7,121,489 B2

We find no merit in the Patent Owner's argument.  The primary reference Caterpillar discloses the use of a locking pin to secure a bridge housing (FF5 D).  Clark is being relied upon for the use of multiple, retractable pins in the art for securement of removable components.  It would have been obvious to one of ordinary skill in the art to use the pins of Clark for the reasons suggested therein to secure the demolition tool resulting from the combination of Caterpillar and Ogawa where the bridge housing is separate from the blades as discussed *supra*.  These claims are directed to a predictable variation wherein one element is substituted for another known in the art.  *KSR*, 550 U.S. at 417; *see also id*. at 416 ("when a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result.")

### NEW DECISION UNDER 37 C.F.R. § 41.77(f):

1.    Claims 1-3, 13-14 and 17-20 stand rejected under 35 U.S.C. § 103 as obvious over Caterpillar in view of Ogawa.

2.    Claims 4-12, 15, 16 and 21 stand rejected under 35 U.S.C. § 103 as obvious over Caterpillar in view of Ogawa and Clark.

peb

25

**A0034**

Appeal 2014-001006
Reexamination Control 95/001,352
Patent US 7,121,489 B2


cc:

Patent Owner:
THE WEBB LAW FIRM, P.C.
ONE GATEWAY CENTER
420 FT. DUQUESNE BLVD, SUITE 1200
PITTSBURGH, PA 15222


Third Party Requestor:
HARNESS, DICKEY & PIERCE, P.L.C.
P.O. BOX 828
BLOOMFIELD HILLS, MI 48303

A0035



# UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/001,352 | 05/05/2010 | 7,121,489 | 15804-000001/US/RXA | 7638 |

28289        7590        09/04/2012
THE WEBB LAW FIRM, P.C.
ONE GATEWAY CENTER
420 FT. DUQUESNE BLVD, SUITE 1200
PITTSBURGH, PA 15222

| EXAMINER |
|---|
| ENGLISH, PETER C |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3993 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 09/04/2012 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES

GENESIS ATTACHMENTS, LLC
Requester, Appellant

v.

ALLIED ERECTING AND DISMANTLING CO., INC., et al.[1]
Respondents

Appeal 2012-007030
*Inter partes* Reexamination Control 95/001,352
Patent US 7,121,489 B2[2]
Technology Center 3900

*Before* JEFFREY B. ROBERTSON, DANIEL S. SONG and
RAE LYNN P. GUEST, *Administrative Patent Judges*.

SONG, *Administrative Patent Judge*

DECISION ON APPEAL

---

[1] Allied Gator, Inc. and inventor John R. Ramun are also identified as real parties in interest (Respondent Brief (hereinafter "Res. Br.") 3). The identified real parties in interest are collectively referred to herein as the "Patent Owner."
[2] Patent US 7,121,489 B2 (hereinafter "'489 patent") issued October 17, 2006 to Ramun.

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2

## STATEMENT OF THE CASE

Claims 1-21 are subject to reexamination and have been allowed (Right to Appeal Notice[3] (hereinafter "RAN") 1). Claims 20 and 21 were added during the reexamination proceeding. Claims 1-19 of the '489 patent were initially rejected during the reexamination proceeding based on various rejections proposed by the Requester, but these adopted rejections were withdrawn in view of the amendments made to each of the independent claims (RAN 2).

The Requester appeals under 35 U.S.C. §§ 134 and 315 from the Examiner's refusal to adopt various proposed rejections, the withdrawal of certain previously adopted rejections, and determinations that certain claims are patentable (Appeal Brief (hereinafter "App. Br.") 4-5). In addition to the Appeal Brief, the Requester also relies on a Rebuttal Brief (hereinafter "Reb. Br."). The Patent Owner relies on a Respondent Brief (hereinafter "Resp. Br.") as well as a Declaration of inventor Mr. Ramun and exhibits therein for support of the Examiner's actions. We have jurisdiction under 35 U.S.C. §§ 134(b) and 315.

An oral hearing with the representatives of the Requester and Patent Owner regarding the appeal was held before the Board of Patent Appeals and Interferences on July 25, 2012. We also note that the '489 patent is involved in litigation styled *Allied Erecting and Dismantling Co. et al. v. Genesis Equip. & Mfg. Inc. et al.*, 4:08-CV-00589 (N.D. Ohio) which has been stayed pending the present reexamination proceeding (App. Br. 2;

---

[3] The Examiner's Answer dated February 3, 2012 (hereinafter "Ans.") incorporates the RAN dated September 23, 2011.

2

A0038

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2

Resp. Br. 3). In the litigation, a Memorandum Opinion was issued on
January 19, 2010 (hereinafter "Dist. Ct. Op.") which construes various terms
of the '489 patent at issue.

We AFFIRM-IN-PART, enter NEW GROUNDS OF REJECTION,
and REMAND for further consideration.

## THE INVENTION

*Findings of Fact*

FF1. A. The '489 patent is directed to a tool attachment system which
allows different tools such as hydraulically actuated metal cutting shears,
concrete crushers, and grapples that have movable jaws to be attached to
equipment such as backhoes (Abstract; col. 1, ll. 20-26).

B. Figure 2 of the '489 patent is reproduced below.



FIG. 2

Figure 2 of the '489 patent reproduced above illustrates a side view of
a shear 10' including a first blade 12 and a second blade 14 pivotally
connected at a main pin 16 to a universal body 18' (col. 3, ll. 55-56; col. 5, ll.
57-59; col. 6, ll. 18-23; Fig. 2).

3

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2

C. The specification of the '489 patent states "[a] bridge housing 48 surrounds the main pin 16 and is utilized for quickly and easily attaching the main pin 16 and the associated jaw set to the universal body 18." (Col. 6, ll. 56-59).

D. Figure 57 of the '498 patent is reproduced below.



FIG. 57

Figure 57 of the '489 patent reproduced above illustrates a perspective view of the quick release system including bridge housing 48 that is positioned against the receiving member 42 and secured thereto by keeper pins 50 which are inserted through the apertures 52 of the bridge housing 48 and the receiving member 42 (col. 5, ll. 46-47; Certificate of Correction dated October 17, 2006, inserting originally filed paragraph [0081]; Fig. 57).

E. The specification of the '489 patent teaches that the advantage of the claimed invention is that "the outer bearing structure surrounding the main pin 16 will remain affixed even when the tool unit is removed from the universal body 18. This provides the advantage that the bearing or rotating surfaces will be protected from dirt and grit even when the tool unit is disassembled." (Col. 6, l. 67-col. 7, l. 5).

F. Figures 8 and 9 of the '489 patent are reproduced below.

4

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2



Figure 8 of the '489 patent reproduced above is a partial sectional view of the shear and the components of the bridge housing 48 with the main pin 16 received therein while Figure 9 illustrates the disassembly of the tool unit (col. 4, ll. 1-6; Fig. 8).

G.   In discussing the bridge housing 48, the specification of the '489 patent states that "the first end 400 of the bridge housing 48 has a sleeve 408 between the two opposing plates 405, 406," and discloses that the sleeve 408 has a support surface 410 (not shown) (Col. 7, ll. 27-30; see also col. 7, ll. 38-40).  Hence, the specification and the illustration of Figure 8 of the '489 patent indicates that the "bridge housing" is an assembly of components.

CLAIMS

Claims 1, 7 and 17-21 are independent claims.  Representative independent claims 1 and 21 on appeal read as follows (Resp. Br., Claims App'x.; bracketed text and underlining removed; italics added for emphasis):

1.   (Once Amended) A tool set for coupling to the receiving member of a body having hydraulically powered blades, the tool set comprising:
        *a pair of movable blades pivoted together about a main pivot pin;*

5

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2

> *a bridge housing encasing the main pivot pin;*
> *wherein the blades are movable relative to the bridge housing;*
> *wherein the bridge housing with the main pivot pin intact therein is adapted to be detachably connected to the receiving member* and the pair of movable blades is adapted to be detachably connected to at least one hydraulic cylinder such that the tool set may be removed from or attached to the body without the need to disengage or engage the main pivot pin from the blades, thereby providing a quick release system for attaching the tool set to the body; and
> wherein the bridge housing has an aperture adapted to be mated with a matching aperture of the receiving member through a removable keeper pin to secure the bridge housing to the receiving member.

21. (New) A demolition tool comprising:
    a) a body having;
        1) a receiving member, and
        2) at least one hydraulic cylinder mounted upon the body;
    b) a tool set for coupling to the receiving member of the body, wherein the tool set has:
        1) *a pair of movable blades pivoted together about a main pivot pin; and*
        2) *a bridge housing encasing the common pivot pin*; and
    c) *wherein the bridge housing with the main pivot pin engaged therein is detachably connected to the receiving member* and the pair of movable blades is detachably connected to the one or more hydraulic cylinders such that the tool set may be removed from or attached to the body without the need to disengage or engage the main pivot pin from the blades, thereby providing a quick release system for attaching the tool set to the body of the demolition tool, and wherein the bridge housing has an aperture adapted to be mated with a matching aperture of the receiving member through removable keeper pins to secure the bridge housing to the receiving member and

6

A0042

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2

> wherein the bridge housing has a support surface adapted to
> mate with a complementary engaging surface of the receiving
> member when securing the bridge housing to the receiving
> member and *wherein the support surface and the engaging
> surfaces are arcuate*.

## PROPOSED REJECTIONS NOT ADOPTED OR WITHDRAWN

1. Claims 1-21 under 35 U.S.C. § 102(b) as anticipated by U.S.
Patent No. 5,062,227 (hereinafter "De Gier").

2. Claims 1, 2, 4-8 and 10-19 under 35 U.S.C. § 102(b) as
anticipated by U.S. Patent No. 4,283,866 (hereinafter "Ogawa").

3. Claims 1-3 and 17-20 under 35 U.S.C. § 102(b) as anticipated by
U.S. Patent No. Re. 35,432 (hereinafter "LaBounty").

4. Claims 4-12 and 21 under 35 U.S.C. § 103 as unpatentable over
LaBounty in view of U.S. Patent No. 4,106,646 (hereinafter "Weisgerber")[4].

5. Claims 13-14 under 35 U.S.C. § 103 as unpatentable over
LaBounty in view of Ogawa.[5]

---

[4] The Appeal Brief identified claim 21 as being unpatentable over the
combination of LaBounty and Weisgerber (App. Br. 4). The Examiner
states that this proposed rejection is not proper in the appeal because it was
"never addressed during the *inter partes* reexamination proceeding." (Ans.).
The Requester argues that claim 21 is characterized by the Respondents as
an independent claim which merely incorporates the limitations of originally
dependent claim 9, and that the patentability of claim 9 was, in fact, argued
by the Requester as being unpatentable over the combination of LaBounty
and Weisgerber (Reb. Br. 1-2). Hence, the Requester argues that
patentability of claim 21 was addressed during the reexamination proceeding
and properly on appeal (Reb. Br. 2). This issue is moot because, as
discussed *infra*, LaBounty fails to disclose "a pair of movable blades pivoted
together about a main pivot pin" and Weisgerber is not relied upon as curing
this deficiency of LaBounty.

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2

6.  Claims 20 and 21 under 35 U.S.C. § 102 as anticipated by German reference DE 297 15 490 U 1 (hereinafter "Caterpillar"; citations to English translation of record).

7.  Claims 1-3, 13, 14, and 17-20 under 35 U.S.C. § 103 as unpatentable over Caterpillar in view of Ogawa.

8.  Claims 4-12, 15, 16 and 21 under 35 U.S.C. § 103 as unpatentable over Caterpillar in view of Ogawa, and further in view of U.S. Patent No. 5,546,683 (hereinafter "Clark").

9.  Claims 20 and 21 under 35 U.S.C. § 102(b) as anticipated by U.S. Patent No. 2,332,561 (hereinafter "Drott").

PRINCIPLES OF LAW

To establish anticipation, every element and limitation of the claimed invention must be found in a single prior art reference, arranged as in the claim. *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1383 (Fed. Cir. 2001). Analysis of whether a claim is patentable over the prior art

---

[5] The Appeal Brief identified claim 21 as being unpatentable over the combination of LaBounty and Ogawa (App. Br. 4).  Moreover, together with this rejection, the Appeal Brief also identified claims 15-16 as being unpatentable over the combination of LaBounty and Weisgerber, and further in view of Ogawa (App. Br. 4).  The Examiner states that these proposed rejections are not proper in the appeal because they "were never addressed during the *inter partes* reexamination proceeding." (Ans.).  The Requester concedes that the rejections of these claims under the combination of LaBounty and Ogawa were not previously addressed in the reexamination (Reb. Br. 3).  Correspondingly, claims 15-16 and 21 are not properly before the Board for review and the Requester's arguments directed thereto are moot.

8

A0044

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2

under 35 U.S.C. § 102 begins with a determination of the scope of the claim.
Claim construction is a question of law.  *See In re Donaldson Co., Inc.*, 16
F.3d 1189, 1192 (en banc) (Fed. Cir. 1994).   We determine the scope of the
claims in patent applications not solely on the basis of the claim language,
but upon giving claims "their broadest reasonable interpretation consistent
with the specification" and "in light of the specification as it would be
interpreted by one of ordinary skill in the art."  *In re Am. Acad. of Sci. Tech.
Ctr.*, 367 F.3d 1359, 1364 (Fed. Cir. 2004).  This is the standard for claim
interpretation in both original examination and re-examination. *See In re
Yamamoto,* 740 F.2d 1569, 1571 (Fed. Cir. 1984).

We must be careful not to read a particular embodiment appearing in
the written description into the claim if the claim language is broader than
the embodiment.  *See Superguide Corp. v. DirecTV Enter., Inc.*, 358 F.3d
870, 875 (Fed. Cir. 2004).  However, "claims are not to be read in a vacuum,
and limitations therein are to be interpreted in light of the specification in
giving them their broadest reasonable interpretation." *In re Okuzawa*,
537 F.2d 545, 548 (CCPA 1976); *In re Marosi*, 710 F.2d 799, 802 (Fed. Cir.
1983).  While the PTO is obligated to give claims their broadest reasonable
interpretation, "any such construction [must] be '*consistent with the
specification,* . . . and . . . claim language should be read in light of the
specification as it would be interpreted by one of ordinary skill in the art.'"
*In re Suitco Surface, Inc.,* 603 F.3d 1255, 1259-60 (Fed. Cir. 2010).

"Section 103 forbids issuance of a patent when 'the differences
between the subject matter sought to be patented and the prior art are such
that the subject matter as a whole would have been obvious at the time the

9

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2

invention was made to a person having ordinary skill in the art to which said subject matter pertains.'" *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). "When a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. If a person of ordinary skill can implement a predictable variation, §103 likely bars its patentability. For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill." *Id.* at 417. The Court also noted that "[t]o facilitate review, this analysis should be made explicit." *Id.* at 418.

## CLAIM CONSTRUCTION ISSUES

During the above noted *Allied Erecting and Dismantling* litigation, the claim term "bridge housing" in the '489 patent was construed to mean "*a structure that engages the main pivot pin and is adapted to be detachably connected to the receiving member*." (Dist. Ct. Op., pg. 34). The term "receiving member" was also interpreted to mean "*portion of the body which receives or accepts the bridge housing of the tool set*." (Dist. Ct. Op., 34).

As discussed in detail *infra* with respect to each of the proposed rejections, the Examiner's decision to not reject the claims is principally based on a finding that the prior art fails to disclose a "bridge housing." The Requester asserts that the term "bridge housing" has been improperly construed by the Examiner in refusing to adopt various proposed rejections and withdrawing the previously adopted rejections based on the amendments

10

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2

made by the Patent Owner (App. Br. 6). The Requester argues that the
Patent Owner cannot advocate for broad construction during infringement
proceeding and then advocate a narrower construction during reexamination
proceedings to avoid invalidity, and that we must interpret the claims at least
as broadly as that adopted by the district court (App. Br. 11-12). However,
we observe that the Patent Owner has not advocated a different claim
interpretation during the present reexamination proceeding, nor did the
Examiner adopt a different interpretation. In this regard, the Requester also
does not advocate a construction that differs from that made by the District
Court. Thus, we find no reason to disturb the actual construction of record,
that is, that "bridge housing" means "a structure that engages the main pivot
pin and is adapted to be detachably connected to the receiving member."

     In addition, we do not subscribe to the Patent Owner and the
Examiner's view that the claim, as properly interpreted, requires the bridge
housing to be a "separate structure" in the manner advocated, wherein the
bridge housing cannot be a component of a larger structure or part. The
claim language does not preclude such an implementation. In this regard,
whereas the Specification of the '489 patent discloses the bridge housing as a
separate structure, we also observe that it is secured to the main pin to form
a removable assembly together with the blades (FF1 B-C), and thus, forms
an assembly with the blades. The "bridge housing" is also not limited to a
unitary, monolithic structure in that the Specification of the '489 patent
discloses that the bridge housing is made of numerous components, i.e., that
it is itself an assembly (FF1 G).

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2

Nonetheless, in view of the claim language and the Specification of the '489 patent, a "bridge housing" must be a distinct structural object (be it unitary/assembly and separated/attached) which serves the function recited in the claims and disclosed in the Specification of the '489 patent.  As a separately recited element in the claims and described as such in the Specification of the '489 patent, a bridge housing must be distinctive and discernable from the other structures.  In particular, the claims which are supported by the Specification of the '489 patent require that the bridge housing be an actual discernable structure which is "detachably connected to the receiving member" and exists for performing the function of allowing the tool set to "be removed from or attached to the body without the need to disengage or engage the main pivot pin from the blades, thereby providing a quick release system for attaching the tool set to the body."  Consistent therewith, the claim interpretation of record requires a singular structure in that it states "*a structure* that engages the main pivot pin and *is* adapted to be detachably connected to the receiving member."  Of course, as noted, "bridge housing" need not be a unitary structure and may be an assembly (FF1 G).

Correspondingly, we disagree with the Requester's position that any portion of any structure of the prior art, regardless of its independent existence and function, satisfies the recited "bridge housing" of the claims.  As discussed *supra*, the drawing of imaginary boundaries which carves out a small portion of a jaw or blade and combining it with other structure to contend that such a combination is a "bridge housing" essentially ignores what a prior art actually discloses, and any claim construction that

12

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2

encompasses such combinations would be unreasonable in view of the
Specification.

Whereas the Requester cites to case law in support of assertion that
multiple claim limitations can be satisfied by a single element, and that
multiple elements can be combined to satisfy a single claim limitation (App.
Br. 12; Reply Br. 4), we observe that claim construction and understanding
of the disclosures in the prior art are facts specific.  While such cases are
instructive for proper claim construction and the manner in which prior art is
applied, what may be considered reasonable under one set of facts may be
unreasonable in another.  The Requester cites to a footnote in *Intellectual
Pro. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc.* in support
of its assertions, but the footnote merely states that the court "see[s] no
reason why, as a matter of law, one claim limitation may not be responsive
to another merely because they are located in the same physical structure" in
reversing a district courts granting of summary judgment of invalidity.
*Intellectual Pro. Dev.*, 336 F.3d 1308, 1320, fn. 9 (Fed. Cir. 2003).  The
footnote in *Intellectual Pro. Dev.* does not stand for the proposition that a
single structure can be read upon multiple claim limitations would be
reasonable and correct irrespective of the facts of the case.  In fact, *In re
Kelly*, also relied upon by the Requester and cited as precedent in the above
noted footnote of *Intellectual Pro. Dev.*, makes clear that claim
interpretation must be reasonable.  *In re Kelly*, 305 F.2d 909, 915-16 (CCPA
1962) ("In a case such as this, where there is no ambiguity in the language of
the claims, they should be carefully analyzed to see if they can be
*reasonably* found to be supported by the disclosed structure. … Each claim

13

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2

in each case must be interpreted as broadly as its language will *reasonably*
*permit and each interpretation will depend upon the individual facts of each*
*case.* … The governing consideration is not double inclusion, but rather is
what is a *reasonable* construction of the language of the claims.")(emphasis
added).

## ANALYSIS

Proposed Rejection 1: Claims 1-21 Anticipated by De Gier

*Findings of Fact*

FF2.   A.   De Gier discloses a device for breaking objects including a pair of
jaws having teeth which are pivotable relative to each other about a pivot pin
(Abst.).   Figures 1 and 3 of De Gier are reproduced below:



Fig.1.                    Fig. 3.

14

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2

Figure 1 reproduced above shows a side elevational view of an arm 1 with a device 11 for breaking objects while Figure 3 reproduced above shows an elevational view of parts of the two jaws 12, 13 that are pivotally coupled together by a pivot pin 14 (col. 2, ll. 27-33, 44-49; col. 3, ll. 1-6; Figs. 1 and 3).

B.   According to De Gier, "jaw 13 comprises three plates 13', 13", 13"', to which teeth 18 are secured[.]" (Col. 3, ll. 13-15; Fig. 3).

C.   Jaws 12 and 13 of De Gier are connected to a coupling piece 24 by a hinge pin 23, the coupling piece 24 being connected to the arm 1 (col. 3, ll. 30-34).

D.   De Gier discloses that the strut 26 and strut 29 are connected to support 25 which is secured to the arm 1 (col. 3, ll. 35-42).

E.   De Gier states that "jaw 13 will assume an at least substantially fixed position relative to the arm 1, so that this jaw is also called the so-called fixed jaw." (Col. 3, ll. 53-57).  Hence, jaw 13 is fixed and does not pivot about pivot pin 14.

*Analysis*

The Requester argues that the Examiner erred in refusing to reject claims 1-21 as being anticipated by De Gier asserting that the limitation "bridge housing" is satisfied by the combination of plates 13' and 13"' of jaw 13, and coupling piece 24 (App. Br. 8).  The Requester also argues that the claim language requiring the blades to be "movable relative to the bridge housing" is satisfied because a portion of the bridge and jaws 12 and 13" move relative to coupling piece 24, and the claims "do not require that the

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2

blades are movable relative to the entire bridge." (App. Br. 11). The
Requester further argues that the Specification of the '498 patent does not
require the bridge housing to be separate, much less provide a written
description of such requirement (App. Br. 11).

The Examiner finds, *inter alia*, that member 13 is part of the claimed
blades, and not a bridge housing, and that De Gier does not disclose a bridge
housing which satisfies the limitations in the claims. In this regard, the
Examiner states that "[t]he language of claims 1-21 makes it clear that the
bridge housing is a separate element/structure from the movable blades" and
this is the only reasonable interpretation of the plain meaning of the terms
(RAN 6). We sustain the Examiner's refusal to adopt the proposed rejection.

Firstly, we disagree with the Requester that the coupling piece 24 and
a portion of the plates 13' and 13'" of jaw 13 in De Gier can be considered to
be a bridge housing. The Requester draws an imaginary boundary which
carves out a small portion of the plates 13' and 13'" around the pivot pin 14
while excluding the teeth 18 of the plates. However, De Gier is clear that
plates 13' and 13'" are actually part of the jaw 13 and have teeth thereon
(FF2 A-D) such that the Requester's strained understanding of De Gier is not
supported by the disclosure therein. There is no credible evidence or
rational basis for the assertion that a person of ordinary skill in the art would
understand the disclosure of De Gier in the manner asserted, or understand
the limitations of the claims of the '489 patent as advocated by the Requester
as discussed *supra*, so as to encompass the coupling piece 24, and selective
portions of the plates 13' and 13'" based on some imaginary boundary
thereon. We find the plates 13' and 13'" of the jaw 13 of De Gier do not

16

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2

satisfy the limitation requiring a bridge housing. The coupling piece 24 of De Gier, on its own, does not encase main pivot pin 14, and thus, also does not satisfy the recited claim language.

We further observe that De Gier also fails to disclose "a pair of movable blades pivoted together about a main pivot pin" as recited in the claims because jaw 13 is fixed (FF2 E). While we do not agree with the Examiner's distinction of the claims based on the fact that arm 1 and strut 29 of De Gier are separate members whereas the claims recites a single "receiving member" (RAN 6), this issue is moot in view of the above noted deficiencies of De Gier. Therefore, we sustain the Examiner's refusal to adopt the proposed anticipation rejection based on De Gier. The remaining disagreements between the Requester and the Examiner with respect to De Gier are moot.

Proposed Rejection 2: Claims 1, 2, 4-8 and 10-19 Anticipated by Ogawa

*Findings of Fact*

FF3. A. Ogawa discloses a convertible bucket attachment for excavation and clasping (Abst.). Figure 4a of Ogawa is reproduced below:

A0053

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2



FIG . 4a

Figure 4a reproduced above shows a side view of the bucket attachment in according to one embodiment including bucket proper 1 and a sub-bucket 2 that are pivotally engaged by pin 5' on arm 11 so that both of the buckets pivot upon actuation of a cylinder actuator 13 (col. 2, l. 59-col. 3, l. 10; Fig. 4a).

B.   In discussing a prior art bucket apparatus, Ogawa states that "provision of a cylinder actuator between the back and the fore bucket has imposed a substantial limitation on the distance of range in which both bucket members can be operatively moved relative to each other, and prevented the range of angular movement of the members from being as wide as 180° as in the embodiment of the invention." (Col. 1, ll. 49-55).

C.   Figures 6 and 7 of Ogawa are reproduced below:

18

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2



Figure 6 shows a side view while Figure 7 shows a plan view, respectively, of a modified embodiment of a bucket attachment including bucket proper 1 having stay 4, sub-bucket 2, pin 5', sub-link members 14, upper link members 16, and bracket 9 which is used to secure the bucket portion to the arm 11 (col. 3, l. 62-col. 4, l. 9). Stay 4 of bucket proper 1 is not attached to bracket 9 (Figs. 6 and 7).

*Analysis*

The Requester argues that the Examiner erred in refusing to reject claims 1, 2, 4-8 and 10-19 as being anticipated by Ogawa asserting that the limitation "bridge housing" is satisfied by the combination of stays 4 rigidly secured to the bucket proper 1, and single brackets 9 (App. Br. 14-15). The Requester also argues that the claim language requiring the blades to be "movable relative to the bridge housing" is satisfied because the buckets 1, 2 move relative to the single brackets 9, and the claims do not require the relative movement to the entire bridge housing or the entire pin to be

A0055

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2

encased by bridge housing (App. Br. 14-16). According to the Requester, arm 11 corresponds to the recited receiving member, and hollow bushes 6 (shown in Figs. 2, 3) correspond to the recited main pivot pin, the hollow bushes 6 being engaged by the stays 4 with single brackets 9 being detachably connected to the arm 11 (App. Br. 14-15).

The Examiner finds, *inter alia*, that Ogawa does not disclose a bridge housing as required by the claims stating that while stays 4 may be considered a bridge housing or portion thereof, the bucket proper 1 is not movable relative thereto, and that single bracket 9 can alternatively be considered a bridge housing or portion thereof, but it does not encase the pivot pin 6 (RAN 4). We sustain the Examiner's refusal to adopt the proposed rejection.

Requester appears to rely on the combination of stays 4 and single brackets 9 to satisfy the recited bridge housing. However, the stays 4 of Ogawa are not attached to the single brackets 9, because Ogawa discloses intervening sub-link members 14 and upper link members 16 there between (FF3 C). As discussed *supra*, while we are of the opinion that "bridge housing" may be an assembly, we do not consider the single brackets 9 of Ogawa forms such an assembly with the stays 4 in a manner that can be characterized as providing a distinctive device or structure that functions to allow for detachable connection to the receiving member. Thus, we sustain the Examiner's refusal to reject these claims as anticipated by Ogawa. The remaining disagreements between the Requester and the Examiner concerning Ogawa are moot.

A0056

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2

<u>Proposed Rejection 3: Claims 1-3 and 17-20 Anticipated by LaBounty</u>

*Findings of Fact*

FF4.    A.    LaBounty discloses a demolition tool for attachment to a boom
structure (Abst.).  Figures 9 and 15 of LaBounty are reproduced below.



Figure 9 of LaBounty reproduced above shows a perspective view of
a wood shear including jaws 22.11 and 23.11 pivoted about a pivot structure
in accordance with one embodiment (col. 3, ll. 1-4; Fig. 9).  Figure 15 of
LaBounty reproduced above is a detailed section view through the pivot
structure (col. 3, ll. 19-20; Fig. 15).

   B.    LaBounty discloses that the tool is "readily demountable" from
frame plates 18.1 by removing the center pivot pin 24 (col. 3, ll. 55-57; col.
6, ll. 17-22).

   C.    LaBounty teaches that the jaws 22 and 23 are secured together by
a pivot pin 58 (*see* col. 6, ll. 14-17).

   D.    The specification of LaBounty states that "[t]he upper swingable
jaw 22 is press fit onto the outer periphery of the connector pin 58.
Accordingly, the upper jaw 22 has a central opening 65 which tightly fits in

21

A0057

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2

a press fit onto the outer periphery of the pin 58 so that the upper jaw 22 will not rotate with respect to the pin 58, but is stationary with the pin 58 which will turn as the upper jaw 22 turns." (Col. 6, ll. 35-40).  Thus, the upper jaw 22 does not pivot about pin 58.

*Analysis*

The Requester argues that the Examiner erred in refusing to reject claims 1-3 and 17-20 as being anticipated by LaBounty asserting that the hollow connector pin 58 corresponds to the recited main pivot pin and that the limitation "bridge housing" is satisfied by the combination of single removable pivot pin 24, bronze bushing 68 and end cap 69 (App. Br. 17). The Requester contends that the "bridge housing" functions to allow removal of the jaws 22 and 23 from the frame plates 18.1, which correspond to the recited receiving member, upon removal of the removable pivot pin 24  while the jaws are still pivotably connected via the hollow connector pin 58 (App. Br. 17).

The Examiner contends that "LaBounty et al. fails to teach a bridge housing that encases the main pivot pin 58 [] or that engages the pivot pin 58 [] wherein the bridge housing with the main pivot pin 58 engaged/intact therein is detachably connected to the receiving members 18.1." (RAN 7). According to the Examiner, a person of ordinary skill in the art "would not consider a pivot pin, a bushing and/or a retainer cap to constitute a 'bridge housing'" because they "are all elements that are distinct from a housing and that might be carried by or supported on a housing." (RAN 7-8).  We sustain the Examiner's refusal to adopt the proposed rejection.

22

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2

Firstly, we observe that in LaBounty, the hollow connector pin 58 is tightly press fitted to the upper jaw 22 so that the upper jaw 22 does not rotate with respect to the pin 58, but is stationary with the pin 58 (FF4 D). Thus, the device of LaBounty does not disclose "a pair of movable blades pivoted together about a main pivot pin" as specifically required by the claims. Whereas the Requester has asserted that "a pair of movable blades pivoted together about a main pivot pin" is disclosed in LaBounty (App. Br. 17),[6] this assertion is not supported by the record. Secondly, we agree with the Examiner that the center pivot pin 24 is not a housing structure and cannot reasonable be considered a component of a "bridge housing." Rather than encasing the hollow connector pin 58 as required by claims 1-3 and 17-19, the center pivot pin 24 is instead, surrounded by the hollow connector pin 58 so as to be nested therein. LaBounty clearly teaches that the center pivot pin 24 is removed in order to demount the jaws from the frame plates 18.1 (FF4 B), and thus, the center pivot pin 24 is a "removable keeper pin" also recited in various claims.

Moreover, we observe that LaBounty includes lower jaw 23 fastened to retainer caps 69 and bronze bushings 68 via cap screws 70 (see col. 6, ll. 48-51; Figure 15), which Requester identifies as components of the "bridge housing" (App. Br. 17). Accordingly, LaBounty would fail to meet the requirement of claims 1-3 and 17-19 that "the blades are movable relative to the bridge housing." Further, we observe that the surfaces where the bridge

---

[6] Compare *Inter Partes* Reexamination Request filed May 5, 2010 (hereinafter "Request") which merely states that the blades of LaBounty are "pivoted together by a main pivot 58" which does not correspond to the claim language (Request, Pg. 22).

A0059

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2

housing (identified by Requester as pin 24, bronze bushings 68 and retainer caps 69) engages the receiving member (identified by Requester as frame 18) are not arcuate, as required by claim 20, but rather appear to be flat (*see* Figure 15).

Therefore, we sustain the Examiner's refusal to adopt the proposed anticipation rejection based on LaBounty. The remaining disagreements between the Requester and the Examiner are moot.

Proposed Rejection 4: Claims 4-12 and 21 obvious over LaBounty and Weisgerber

The Requester's proposed obviousness rejection of claim 4-12 and 21 over the combination of LaBounty and Weisgerber relies on the disclosure of LaBounty which we find inadequate for the reasons discussed *supra* relative to Proposed Rejection 3 (App. Br. 20). Weisgerber is not relied upon to cure the discussed deficiencies of LaBounty. Therefore, we sustain the Examiner's refusal to adopt the proposed obviousness rejection based on the combination of LaBounty and Weisgerber.

Proposed Rejection 5: Claims 13-14 obvious over LaBounty and Ogawa

The Requester's proposed obviousness rejection of claim 13-14 over the combination of LaBounty and Ogawa relies on the disclosure of LaBounty which we find inadequate for the reasons discussed *supra* relative to Proposed Rejection 3 (App. Br. 22). Ogawa is not relied upon to cure the discussed deficiencies of LaBounty. Therefore, we sustain the Examiner's

A0060

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2

refusal to adopt the proposed obviousness rejection based on the combination of LaBounty and Ogawa.

### Proposed Rejection 6:  Claims 20 and 21 Anticipated by Caterpillar

*Findings of Fact*

FF5.   A.   Caterpillar discloses a demolition shear such as a scrap metal shear (Pg. 5).  Figures 1 and 2 of Caterpillar are reproduced below.



Figure 1 of Caterpillar reproduced above shows a lateral view of a scrap metal shear 10 with its jaws removed (Pg. 5; Fig. 1).  Figure 2 of Caterpillar reproduced above shows a frontal, partial cross-sectional view of the scrap metal shear of Figure 1 (Pg. 5; Fig. 2).

A0061

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2

B. Caterpillar discloses that scrap metal shear 10 has a housing 11 to which first jaw 13 and second jaw 14 are attached, the second jaw being pivotably mounted via swivel bearing 15 and operable via a hydraulic cylinder 16 (Pg. 6; Figs. 1 and 2).

C. Figure 1 of Caterpillar illustrates that when the jaws of the scrap metal shear 10 is removed, the swivel bearing 15 remains pivotably connecting the first jaw 13 and the second jaw 14 together (Fig. 1).

D. Caterpillar discloses that the first jaw 13 includes a pair of opposing lateral walls 13a having holding fixtures 19 and 20 which are used to attach the first jaw 13 to the housing 11, the holding fixture 19 including grooves 22 with receptacle section 22b in the lateral wall 13a for receiving a pin 21, 21a, and holding fixture 20 including a bore hole 23 in the lateral wall 13a for receiving a locking pin 25 (Pg. 6-7).

E. Figure 1 of Caterpillar also illustrates that the swivel bearing 15 is mounted via lateral walls 13a (Fig. 1).

F. Figures 1 and 2 of Caterpillar further illustrates that the lateral walls 13a are distinct structures of the first jaw 13 made as a bracket plate that is attached transversely spaced from the remainder of the first jaw which includes the teeth portion (Figs. 1 and 2).

G. Caterpillar teaches that the holding fixtures 19 and 20 with grooves 22 and bore hole 23 in the lateral walls 13a allow for disassembly "in [a] simple fashion" by merely pulling the locking pin 25 out of the bore holes 23." (Pg. 7).

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2

*Analysis*

Preliminarily, we observe that claims 20 and 21 do not require that the blades be movable relative to the bridge housing.  The Requester argues that the broadest reasonable interpretation of the claims does not require two separate structures, but instead, a single structure can encompass two claim elements (App. Br. 22-23).  According to the Requester, the first jaw 13 includes bridge housing 13a which engages/encases the swivel bearing 15 which corresponds to the main pivot pin recited in the claims (App. Br. 23).

In refusing to adopt the proposed anticipation rejection, the Examiner contends that Caterpillar does not disclose a bridge housing and that the lateral walls 13a of Caterpillar "are an integral portion of the jaw/blade 13" whereas the language of claims makes clear that "the bridge housing is a separate structure from the movable blades."  (RAN 9).

As discussed *supra*, we do not agree with either the Examiner or the Requester as to what the limitation "bridge housing" requires and encompasses.  In our view, Caterpillar does disclose a "bridge housing" as recited by the claims in that the side walls 13a are distinct, discernable structures, and the side walls 13a serves the function of allowing the jaws to "be removed from or attached to the body without the need to disengage or engage the main pivot pin from the blades, thereby providing a quick release system for attaching the tool set to the body" as recited by the claims and described in the Specification of the '489 patent (FF5 A-G).  While the side walls 13a are attached to the remaining structure of the first jaw 13, we do not consider the claims to require physical independence or separation.  To the extent that physical independence or separation from a jaw was the

27

A0063

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2

intended meaning of the limitation, the Patent Owner has had an adequate opportunity to amend the claims accordingly (App. Br. 22).

Nonetheless, we sustain the Examiner's refusal to adopt the proposed rejection of claims 20 and 21 as being anticipated by Caterpillar. Both of these claims specifically recite "a pair of movable blades pivoted together about a main pivot pin." This limitation requires that both blades to be pivoted about the same main pivot pin. We fail to see how the device of Caterpillar can reasonably be said to disclose the first jaw 13 as pivoting together with the second jaw 14 about the swivel bearing 15. The first jaw 13 does not pivot about the swivel bearing 15 (FF5 A, B). Rather, cross brace 25 fixes first jaw 13 to the housing 11 via bore holes 23 and 24 (*see* Caterpillar Pg. 6; Figure 2). Correspondingly, we sustain the Examiner's refusal to adopt the proposed anticipation rejection based on Caterpillar.

Proposed Rejection 7: Claims 1-3, 13, 14 and 17-20 as obvious over Caterpillar and Ogawa

The Requester argues that based on Ogawa's general teaching of providing two movable blades, it would have been obvious for a person of ordinary skill in the art "to modify Caterpillar to make the blade 13 pivotable about the existing pivot pin 15 such that the blades 13 and 14 are each driven by the hydraulic cylinder via separate linkages connected to the blades. This modification would allow the pair of pivotal blades 13, 14 to be opened wider to accommodate larger objects and also allow greater force to be applied to the objects." (App. Br. 25).

28

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2

The Examiner disagrees and contends that whereas the claims make clear that the bridge housing is a separate structure from the movable blades, Caterpillar fails to teach a separate bridge housing that encases or engages the main pivot pin 15 and which is detachably connected to the receiving member of the body (RAN 15). According to the Examiner, even if lateral walls 13a were considered bridge housing, "such portion 13a in Caterpillar corresponds to [stays] 4 in Ogawa. Both Caterpillar's portion 13a and Ogawa's [stays] 4 are integral with one of the movable blades and not movable relative thereto as required by the claims. Accordingly, the teachings of Ogawa would not lead one of ordinary skill in the art to modify Caterpillar to make both blades 13, 14 movable relative to the portion 13a." (RAN 15).

We agree with the Requester that these claims would have been obvious in view of the combination of Caterpillar and Ogawa. Caterpillar teaches one of ordinary skill in the art the desirability of simplifying disassembly of jaws, and discloses a mechanism for doing so in the lateral walls 13a having holding fixtures 19 and 20 (FF5 A, D-G). The lateral walls 13a, while illustrated as being attached to the remainder of the first jaw 13, are also depicted as a distinct structural portion made as a bracket plate that is attached transversely spaced, and perpendicular, to the remainder of the first jaw (FF5 A, F). The Examiner's correlation of the lateral walls 13a of Caterpillar to the stays 4 of Ogawa ignores the specific function of the lateral walls 13a in allowing for simplified disassembly of the jaws of Caterpillar (FF5 D-G), such function being absent in Ogawa.

A0065

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2

The Requester has also pointed to Ogawa's general teaching that providing two movable blades are known, and has articulated a rational reason for modifying Caterpillar "to make the blade 13 pivotable about the existing pivot pin 15" so as to allow the blades to be opened wider (App. Br. 25). In this regard, we further observe that pivotable mounting of the first blade 13 in Caterpillar would allow for minimizing movement of the object grasped since the object would be grasped on opposing sides thereof by moveable blades rather than a single moving blade which applies grasping force from only one side until the object abuts the non-movable blade. To the extent it can be argued that Ogawa specifically discloses buckets rather than blades, Ogawa is in the same field of endeavor as the device of Caterpillar, and Ogawa also specifically discloses the clasping function (FF3 A; *see also* Fig. 4b) which is an essential function of the device of Caterpillar. Ogawa also specifically discloses the provision of wide range of angular movement (FF3 A).

Thus, it would have been obvious to one of ordinary skill in the art to apply the teaching of Ogawa with respect to articulation of both grasping members and wide range of angular movement to thereby modify Caterpillar so that the first jaw 13 with the teeth thereon also pivots about the swivel bearing 15 like second jaw 14, while also maintaining the simplified mounting and disassembly via the lateral walls 13a with their holding fixtures 19, 20 so that the jaws can be disassembled in a simple manner as specifically taught therein (FF5 D). In our view, it would be apparent and within the skill of one of ordinary skill in the art that such modification to the device of Caterpillar may be attained, and within his/her skill to, for

30

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2

example, provide another mounting structure like the lateral walls 13a, or alternatively, making the teeth portion of the first jaw 13 to be separately mounted to the swivel bearing 15, as taught by Ogawa. While the above suggested modification to Caterpillar would entail design and structural changes, we observe that it is not necessary that the inventions of the references must be physically combinable, without change, to render obvious the invention under review. *In re Sneed*, 710 F.2d 1544, 1550 (Fed. Cir. 1983); *see also In re Keller*, 642 F.2d 413, 425 (CCPA 1981) ("[t]he test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference; nor is it that the claimed invention must be expressly suggested in any one or all of the references. Rather, the test is what the combined teachings of the references would have suggested to those of ordinary skill in the art.").

As to claim 20, the Examiner states that Caterpillar and Ogawa fail to disclose a bridge housing that have an arcuate support surface to mate with a complementary arcuate engaging surface of the receiving member as required by the claim (RAN 15-26). However, we observe that Caterpillar illustrates that the receptacle section 22b in the lateral walls 13a as having an arcuate surface which receives a complementary arcuate pin 21, 21a (FF5 A, D). Thus, in view of the above, the Examiner's refusal to reject independent claims 1 and 17-20 as obvious in view of the combination of Caterpillar and Ogawa is reversed.

The Requester also further requests the reversal of the Examiner's refusal to reject dependent claims 2-3 and 13-14 that ultimately depend from independent claim 1 (App. Br. 25). The Requester contends that the

A0067

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2

receptacle section 22b and arcuate pin 21a satisfy the recited limitations
(App. Br. 25).  Indeed, the limitations of claims 2 and 3 generally
correspond to the arcuate support surface limitation of claim 20, and thus,
are obvious for the reason already discussed.  As to claim 13 which requires
a single hydraulic cylinder, this feature is clearly disclosed in Caterpillar and
Ogawa (*see* FF3 A, FF5 A-B).

Claim 14 recites "further including for each blade a separate linkage
connected to that blade and adapted to be detachably connected to the at
least one hydraulic cylinder."  The Requester contends that this limitation is
disclosed in Ogawa by separate linkages 15, 16 (App. Br. 25).  We agree
with the Requester that such a configuration using separate linkage to
operate two pivoting blades would have been obvious to one of ordinary
skill in the art, especially in view of Ogawa which specifically discloses
such separate linkages for actuating the pivoting blades (*see* FF3 A).

Thus, in view of the above, the Examiner's refusal to adopt the
Requester's proposed rejection of claims 1-3, 13-14, and 17-20 as obvious in
view of the combination of Caterpillar and Ogawa is REVERSED and
denominated as a NEW GROUND OF REJECTION pursuant to our
authority under 37 C.F.R. § 41.77(a) & (b).

Proposed Rejection 8: Claims 4-12, 15-16 and 21 Obvious Over
Caterpillar, Ogawa and Clark

The Requester further appeals the Examiner's refusal to adopt the
proposed obviousness rejection of claims 4-12, 15-16 and 21 as obvious
over the combination of Caterpillar, Ogawa and Clark (App. Br. 27-29).

32

**A0068**

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2

The Examiner refused to adopt the Requester's proposed rejection of these claims stating that Clark "fail[s] to cure the deficiencies of Caterpillar and Ogawa" discussed *supra* (RAN 16).  However, as discussed, we disagree with the Examiner's analysis as to obviousness of various claims based on the combination of Caterpillar and Ogawa.  Hence, the Examiner's refusal to reject claims 4-12, 15-16 and 21 as being obvious over the combination of Caterpillar, Ogawa and Clark is REMANDED for reconsideration in view of our reversal of the Examiner's refusal to adopt Proposed Rejection 7.

<u>Proposed Rejection 9: Claims 20 and 21 Anticipated by Drott</u>
*Findings of Fact*

FF6.   A.   Drott discloses a material handling apparatus for removing obstructions (Title; Pg. 1, col. 1, ll. 1-4).  Figures 1 and 3 of Drott are reproduced below.

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2



Figure 1 of Drott reproduced above is a side elevation view of the

material handling apparatus including pusher blade 25 and gripper and scoop

member 42 pivotably connected thereto via pin 47, as well as slotted bracket

54 to which support 51 is connected (Pg. 1, col. 1, ll. 36-37, col. 2, ll. 20-33;

Pg. 2, col. 1, ll. 35-51, 54-65; Fig. 1). Figure 3 of Drott reproduced above

shows a detailed view of parts of the apparatus (Pg. 1, col. 1, ll. 39-40; Fig.

3).

    B.  Drott illustrates the support 51 being connected to the pusher

blade 25 via pin 52, and discloses that "[t]he slotted bracket 54 compensates

or provides for relative movement between the support 51 for the cylinder

34

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2

50 and the tiltable frame or arm 23 with which it is connected so as to allow independent tilting movement of each arm 23, so that the scoop member 42 may be tilted vertically." (Pg. 2, col. 1, ll. 54-65; col. 2, ll. 16-22; Fig. 1).

*Analysis*

The Examiner refuses to reject the claims stating that the structure 25, relied upon by the Requester as the "bridge housing," constitutes a blade, and thus, does not satisfy the claims because the language of claims makes it clear that the bridge housing is a separate structure (RAN 10). The Requester argues that the Examiner erred in refusing to reject claims 20 and 21 as being anticipated by Drott asserting that Drott discloses a pair of movable blades 25, 42 pivoted about pin 47, and that the limitation "bridge housing" is satisfied by the "back frame of blade 25" which engages the pin 47 (App. Br. 29).

While we do not necessarily agree with the Examiner that the claims require the bridge housing to be a separate structure as discussed *supra*, we nonetheless find that Drott fails to anticipate these claims. These claims clearly require "a pair of movable blades pivoted together about a main pivot pin." While the disclosed device of Drott includes a pusher blade 25 and pin 47, there is no disclosure that pusher blade 25 pivots about pin 47. In particular, whereas Drott discloses a slotted bracket 54 which enables vertical tilting of the scoop member 42 (FF6 B), this does not mean that the pusher blade 25 pivots about pin 47. Indeed, the end of the pusher blade 25 opposite of the pin 47 is secured to the arm 23 while the pin 47 is not mounted to any stationary structural member so as to allow for the pusher

A0071

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2

blade to pivot about the pin 47 (FF6 A; *see also* Fig. 1).  Hence, in Drott, the pin 47 moves in conjunction with movement of the pusher blade 25.  To any extent that the pusher blade 25 can be said to pivot, it pivots about pin 52, not pin 47 about which only blade 42 pivots.  Correspondingly, Drott fails to teach a "main pivot pin" about which both blades pivot.  Therefore, because Drott fails to disclose "a pair of movable blades pivoted together about a main pivot pin," we find that it does not anticipate claims 20 and 21.


## ORDERS

The Examiner's decisions with respect to the following Proposed Rejections of the Requester are AFFIRMED-IN-PART as follows:

1.   Refusal to reject claims 1-21 as being anticipated by De Gier is AFFIRMED.

2.   Refusal to reject claims 1, 2, 4-8 and 10-19 as being anticipated by Ogawa is AFFIRMED.

3.   Refusal to reject claims 1-3 and 17-20 as being anticipated by LaBounty is AFFIRMED.

4.   Refusal to reject claims 4-12 and 21 as being unpatentable over LaBounty in view of Weisgerber is AFFIRMED.

5.   Refusal to reject claims 13-14 as being unpatentable over LaBounty in view of Ogawa is AFFIRMED.

6.   Refusal to reject claims 20 and 21 as being anticipated by Caterpillar is AFFIRMED.

7.   Refusal to reject claims 1-3, 13-14, and 17-20 as being unpatentable over Caterpillar in view of Ogawa is REVERSED and

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2

denominated as a NEW GROUND OF REJECTION pursuant to our authority under 37 C.F.R. § 41.77(a) & (b).

8.    Refusal to reject claims 4-12, 15-16 and 21 as being unpatentable over Caterpillar in view of Ogawa and Clark is REMANDED for further consideration.

9.    Refusal to reject claims 20 and 21 as being anticipated by Drott is AFFIRMED.


### AFFIRMED-IN-PART; 37 C.F.R. § 41.77(b); REMANDED


This decision contains new grounds of rejection pursuant to 37 C.F.R. § 41.77(b) which provides that "[a]ny decision which includes a new ground of rejection pursuant to this paragraph shall not be considered final for judicial review." Correspondingly, no portion of the decision is final for purposes of judicial review. A requester may also request rehearing under 37 C.F.R. § 41.79, if appropriate, however, the Board may elect to defer issuing any decision on such request for rehearing until such time that a final decision on appeal has been issued by the Board.

For further guidance on new grounds of rejection, see 37 C.F.R. § 41.77(b)-(g). The decision may become final after it has returned to the Board. 37 C.F.R. § 41.77(f).

37 C.F.R. § 41.77(b) also provides that the Patent Owner, WITHIN ONE MONTH FROM THE DATE OF THE DECISION, must exercise one of the following two options with respect to the new grounds of rejection to avoid termination of the appeal as to the rejected claims:

A0073

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2

(1) *Reopen prosecution.* The owner may file a response requesting reopening of prosecution before the examiner. Such a response must be either an amendment of the claims so rejected or new evidence relating to the claims so rejected, or both.

(2) *Request rehearing.* The owner may request that the proceeding be reheard under § 41.79 by the Board upon the same record. …

Any request to reopen prosecution before the examiner under 37 C.F.R. § 41.77(b)(1) shall be limited in scope to the "claims so rejected." Accordingly, a request to reopen prosecution is limited to issues raised by the new ground(s) of rejection entered by the Board. A request to reopen prosecution that includes issues other than those raised by the new ground(s) is unlikely to be granted. Furthermore, should the patent owner seek to substitute claims, there is a presumption that only one substitute claim would be needed to replace a cancelled claim.

A requester may file comments in reply to a patent owner response. 37 C.F.R. § 41.77(c). Requester comments under 37 C.F.R. § 41.77(c) shall be limited in scope to the issues raised by the Board's opinion reflecting its decision to reject the claims and the patent owner's response under paragraph 37 C.F.R. § 41.77(b)(1). A newly proposed rejection is not permitted as a matter of right. A newly proposed rejection may be appropriate if it is presented to address an amendment and/or new evidence properly submitted by the patent owner, and is presented with a brief explanation as to why the newly proposed rejection is now necessary and why it could not have been presented earlier.

Appeal 2012-007030
Reexamination Control 95/001,352
Patent US 7,121,489 B2

Compliance with the page limits pursuant to 37 C.F.R. § 1.943(b), for all patent owner responses and requester comments, is required.

The examiner, after the Board's entry of a patent owner response and requester comments, will issue a determination under 37 C.F.R. § 41.77(d) as to whether the Board's rejection is maintained or has been overcome. The proceeding will then be returned to the Board together with any comments and reply submitted by the owner and/or requester under 37 C.F.R. § 41.77(e) for reconsideration and issuance of a new decision by the Board as provided by 37 C.F.R. § 41.77(f).

ack

cc:

Patent Owner:
THE WEBB LAW FIRM, P.C.
ONE GATEWAY CENTER
420 FT. DUQUESNE BLVD, SUITE 1200
PITTSBURGH, PA 15222

Third Party Requestor:
HARNESS, DICKEY & PIERCE, P.L.C.
P.O. BOX 828
BLOOMFIELD HILLS, MI 48303

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on May 14, 2015, copies of the foregoing Brief of Respondent-Appellant was served on counsel for Petitioner-Appellee via the Court's ECF system upon the following:

Ryan W. Massey
Harness, Dickey & Pierce, P.L.C.
5445 Corporate Drive, Suite 200
Troy, MI 48098
248.641.1600
248.641.0270 (fax)
rwmassey@hdp.com


/s/ Daniel H. Brean
Daniel H. Brean
*Counsel for Appellant*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that the body of this brief, beginning with the Jurisdictional Statement on page 1, and ending with the last line of the conclusion on page 55, including headings, footnotes, and quotations, is presented in Times New Roman 14-point font and contains 9,788 words, in compliance with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

/s/ Daniel H. Brean
Daniel H. Brean
*Counsel for Appellant*